718 So.2d 159 (1998)
Robert T. HAWK, Appellant,
v.
STATE of Florida, Appellee.
No. 88179.
Supreme Court of Florida.
September 17, 1998.
*160 James Marion Moorman, Public Defender, and A. Anne Owens, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Robert T. Hawk. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but vacate the death sentence and remand for imposition of a life sentence without possibility of parole for twenty-five years.
Sixteen-year old Beth Teas saw Robert Hawk enter the back door of the house next door at about 11 a.m. on February 19, 1993. The house was occupied by Matthew and Betty Gray, an elderly deaf couple. Teas called the police and a few minutes later saw Hawk leave the house, get into the Grays' car, and drive away. When police arrived, they discovered that the house had been forcibly entered and that Matthew and Betty had been bludgeoned. Betty was dead; Matthew was alive.
On February 18 and 19, Hawk, who is deaf, visited several friends and showed them the Grays' car and a wad of money and told them, via sign language, that he had killed someone. When the friends questioned him, he revealed blood on his clothes. He was arrested shortly after the murder and gave police a statement through a sign interpreter wherein he admitted entering the Grays' house and taking the car, but he denied killing anyone. He was charged with first-degree murder and attempted first-degree murder and testified during the guilt phase of his trial, again via a sign interpreter. He claimed that he had used drugs and alcohol on the day of the crimes and remembered nothing. He was convicted as charged.
During the penalty phase, Hawk's mother testified as follows: Hawk contracted spinal meningitis at age three and lost his hearing; because he could not hear, he was physically abused by his father and displayed behavior problems in school; and by age sixteen, he was using drugs and alcohol. The jury recommended death by an eight-to-four vote. During the sentencing hearing before the judge, a defense expert, Dr. Berland, testified that Hawk is brain-damaged and mentally ill, probably as a result of the meningitis. The court imposed a sentence of death based on two aggravating circumstances,[1] two statutory mitigating circumstances,[2] and several nonstatutory mitigating circumstances.[3] The *161 court imposed a consecutive thirty-year term on the attempted murder count. Hawk raises nine issues on appeal.[4]
Hawk first claims that his statement to police was involuntary. We disagree. The issue at this point is not whether the statement was voluntarythat was for the trial court to determine. Rather, the issue is whether competent substantial evidence supports the court's denial of Hawk's motion to suppress the statement. See Escobar v. State, 699 So.2d 988 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1512, 140 L.Ed.2d 666 (1998). At the suppression hearing, the court heard live testimony from both the interviewing officer, Michael Madden, and a sign interpreter from the Deaf Service Center, Nancy Freeland.[5] Hawk did not testify. Hawk's allegation of coercion is belied by both Madden's and Freeland's testimony, which is supported by the transcript of the interview. We find no error.[6]
Hawk next claims that the State failed to adequately prove that he committed first-degree murder. We disagree. Our function at this point is to review the record to determine whether competent substantial evidence supports the conviction. See, e.g., Foster v. State, 679 So.2d 747 (Fla.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997). The verdict states that Hawk was found guilty of first-degree murder "as charged." The indictment charged that Hawk "from a premeditated design to effect the death of Betty Gray, a human being, did strike the said Betty Gray with a blunt object." Evidence of premeditation is extensive.[7] We find no error.
Hawk next contends that several of the prosecutor's statements were impermissibly inflammatory and require reversal.[8] We *162 disagree. The issue is whether the trial court abused its discretion in responding to defense counsel's objections. See, e.g., Bonifay v. State, 680 So.2d 413 (Fla.1996). A trial court's ruling on a discretionary matter will be sustained unless no reasonable person would agree with the view adopted by the court. Huff v. State, 569 So.2d 1247 (Fla. 1990).
The present record reveals the following: As to the "amoral, vicious, cold-blooded killer" comment, the court instructed the jury to disregard the comment;[9] as to the "outrageous" comment, the statement in context was innocuous; as to the "taking life for granted" comment, the issue was not preserved; as to the "savage killer" comment, the matter was not preserved; and as to the "insult to all who have achieved greatness" comment, the statement was inappropriate but does not constitute reversible error on this record. See Jones v. State, 652 So.2d 346 (Fla.1995). We cannot say on this record that no reasonable person would agree with the trial court's handling of the prosecutor's comments. We find no error. Once again, we caution prosecutors to exercise propriety when commenting in the jury's presence reversal of a criminal conviction is a high price to pay for a slip of the advocate's tongueand we urge trial courts to police with vigilance any hint of impropriety.
Hawk claims that the trial court erred in allowing Matthew Gray (the bludgeoning victim who survived) to testify without conducting a competency hearing. We disagree. A witness is presumed competent to testify until the contrary is established. See generally § 90.601, Fla. Stat. (1993). A court's ruling on competency will be upheld absent an abuse of discretion. Lloyd v. State, 524 So.2d 396 (Fla.1988). The present record shows that Matthew was called as a witness by the State to rebut Hawk's surprise testimony alleging that the Grays had sexually abused him as a child. Matthew's testimony was extraordinarily brief.[10] We cannot say on this record that no reasonable person would adopt the view taken by the trial court. See Huff. We find no error.
Hawk next claims that the State failed to prove the existence of the pecuniary gain aggravating circumstance. We disagree. Again, the issue is whether competent substantial evidence in the record supports the trial court's finding. See Willacy v. State, 696 So.2d 693 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997). Our review of the record shows that adequate evidence supports the finding.[11] We find no error.
Hawk contends that his sentence of death is disproportionate to other cases *163 wherein we vacated the death sentence and remanded for imposition of a life sentence. We agree. In the present case, the two aggravating circumstances (i.e., pecuniary gain, and the contemporaneous attempted murder of Matthew Gray) are arrayed against copious mitigation. The court explained its finding of the "impaired capacity" statutory mitigator:
The forensic psychologist that testified for the defense concluded that the Defendant had impairment from a brain injury. The clinically and statistically significant findings show evidence of some damage to the cerebral cortex of the Defendant. The damage probably occurred when the Defendant, as a small child, had spinal meningitis at which time he became deaf. The Defendant testified to being under the influence of alcohol and drugs at the time of the offense and remembering nothing. The Defendant's expert further opined that psycho-active substances tend to [exacerbate] existing mental illnesses. Finally, the Defendant's mother started taking the Defendant to psychologists at the age of five (5) as the Defendant had poor impulse control even as a child. The Court is reasonably convinced, from the totality of the testimony presented, that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired and has weighed and considered this mitigator.
The court also found as a second statutory mitigator that the defendant was only nineteen years old at the time of the crimes.
The court found numerous nonstatutory mitigating circumstances, including brain damage, mental and emotional disturbance, loss of hearing, disadvantaged and abusive childhood, and lack of education and training. The court noted:
The Defendant's spinal meningitis, which took away his hearing, and to a reasonable degree of certainty caused the resulting brain damage and the ripple effect which those events had on the Defendant's life, [is] considered by this Court to be a non-statutory mitigator which the Court has given some weight to.
As explained above, four jurors voted for a life sentence despite the fact that the jury did not have the benefit of Dr. Berland's testimony, which was vastly mitigating.
Dr. Berland stated in no uncertain terms that Hawk is brain-damaged and mentally ill and suffers from delusional thinking and hallucinations, all of which probably arise from the meningitis that ravaged his nervous system as a child. Dr. Berland's findings were based on two standardized tests:
It's my belief this is a valid profile representing his mental illness. The test profile indicatesfirst of all, the first thing we look at is whether it's faked or not. It does not appear to be faked. His F score is in the range typical for someone with an active psychosis, and that doesn't mean that's not someone who can walk and talk, but inside at least they are experiencing some kinds of delusions, hallucinations and mood disturbance.
And we can see he's got a score on the scale which indicates delusional paranoid thinking, which is before the cutoff. He has a score on the schizophrenia scale which, among other things, indicates hallucinations which is well above the cutoff.
From a strictly clinical point of view this is an extremely unusual profile because we have a score on this scale, the mania scale, and I truthfully, in all the years I've done this, don't believe I've ever seen a nonscore that high. That is important because the assumption, the false assumption is that people who are manic are all very hyperactive and you can tell. And that has not proven to be the case in my experience
There are some manics who are very calm, sedate, can talk to you very normally, but inside they're experiencing all the things a manic experiences. The mania is important because it adds fuel to whatever disturbance he has in terms of his likelihood of acting on whatever bizarre or aggressive impulses he has.
Somebody without that mania could have the same bizarre or aggressive impulses and would be very unlikely to act on them. Somebody with that much mania is almost assuredly going to feel so much pressure he is not going to be able to resist acting *164 on those kinds of things. So this is a very energized profile, very disturbed profile. Somebody who would probably respond well to a lot of structure, and not well to a loss of structure.
So basically, it's my opinion that this is the genuine profile, it reflects biologically determined mental illness, symptoms that are associated with biological defect and brain functioning. We, of course, have some basis for thinking he might have a defect in brain functioning since he came to be deaf through meningitis which causes brain damage, and this appears to be part of the outcome of that. That's basically what I get out of that MMPI.
....
This represents a difference of four standard deviations, so it is both clinically and dramatically significant. It is unlikely that this difference would occur by chance. What it reflects then is damage to brain tissue, and, of course, brain injury is one of the two principal causes of psychosis, the other one being inheritance. That's what I get from the Wechsler.
We note that Dr. Berland's testimony was uncontroverted.
Based on the foregoing, we find that Hawk's death sentence is disproportionate.[12] His remaining claims are without merit.[13] We affirm the convictions and consecutive thirty-year sentence. We vacate the death sentence and remand for imposition of a life sentence without possibility of parole for twenty-five years on the first-degree murder count.
It is so ordered.
HARDING, C.J., and OVERTON and SHAW, JJ., concur.
WELLS, J., concurs with an opinion.
PARIENTE, J., concurs in result only with an opinion, in which KOGAN and ANSTEAD, JJ., concur.
WELLS, Justice, concurring.
I concur in result only as to the sentence.
I concur with the reduction of the sentence because of the trial court's finding that appellant has brain damage related to his childhood spinal meningitis which had an objectively discernable effect upon appellant's behavior throughout his teenage years.
PARIENTE, Justice, concurring.
I concur in the result. I write to express my disapproval of several of the prosecutor's improper closing arguments in the penalty phase. In particular, I am troubled by the prosecutor's argument that a recommendation of life would be "an insult to all who have achieved greatness and lived law abiding and productive lives in spite of the same handicap." This argument was objected to, but the objection was overruled. This argument is totally improperan exhortation to send a "message to the community" and a blatant appeal to the juror's prejudices and passions, especially because the victims were *165 deaf, as were a number of witnesses. See Campbell v. State, 679 So.2d 720, 724 (Fla. 1996); King v. State, 623 So.2d 486, 488 (Fla.1993). As we recently emphasized in King:
Closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant." Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985). Furthermore, if "comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument." Garron v. State, 528 So.2d 353, 359 (Fla.1988).
King, 623 So.2d at 488. In addition, the prosecutor, during the penalty phase, referred to the mitigating factors as "nothing but pathetic excuses to explain away the actions of a savage killer." Labeling the uncontroverted mitigating evidence as "pathetic excuses" was clearly improper. See Urbin v. State, 714 So.2d 411, 422, 23 Fla. L. Weekly S257, S261 n. 14 (Fla. May 7, 1998). The mitigating factors, such as brain damage, were in fact unrefuted.
Because we are reversing the imposition of the death penalty, we need not reach the issue of whether these remarks in combination with the other remarks referred to by the majority would warrant reversal for a new sentencing. See, e.g., Garron, 528 So.2d at 360. However, in the strongest possible terms, I condemn the prosecutor's numerous impermissible arguments, many of which were properly preserved by objection.
KOGAN and ANSTEAD, JJ., concur.
NOTES
[1] The court found that Hawk had been convicted of a prior violent felony (i.e., the attempted murder of Matthew Gray), and that the murder was committed for pecuniary gain.
[2] The court found that Hawk's capacity to appreciate the criminality of his conduct was substantially impaired, and that he was nineteen years old at the time of the murder. The court gave the second factor little weight.
[3] The court noted: "The Defendant's spinal meningitis, which took away his hearing, and to a reasonable degree of certainty caused the resulting brain damage and ripple effect which those events had on the Defendant's life, are considered by this Court to be a non-statutory mitigator which the Court has given some weight to." Further: "The Defendant presented a profile that would suggest that he had poor impulse control. The Court has again considered the totality of all the testimony and feels that this is a non-statutory mitigating factor. Since this Court has previously considered this factor as a statutory mitigating factor ... this Court gives little weight to this." The court considered several other factors proposed by Hawk (i.e., hearing loss, lack of father figure, physical abuse as a boy, mental deficiencies, additional sentence for attempted murder, disadvantaged childhood, abusive parent, lack of education and training, and emotional distress) but did not give them great weight.
[4] Hawk claims that the trial court erred in addressing the following matters: (1) admission of Hawk's statement; (2) insufficient evidence; (3) improper prosecutorial comments; (4) allowing Matthew Gray to testify; (5) constitutionality of the heinous, atrocious, or cruel (HAC) instruction; (6) instructing the jury on HAC when the court did not find HAC; (7) failure to instruct the jury on the sentencing option of life without parole; (8) pecuniary gain; (9) proportionality.
[5] Madden testified that he and Freeland went to Hawk's home and asked him to come to the station voluntarily for questioning. Hawk agreed and was not placed under arrest at that time. At the station, Madden read Hawk Miranda warnings and he agreed to answer questions. The entire interview, which lasted approximately forty minutes, was audio taped and transcribed. Both Madden and Freeland testified that Hawk understood his rights and had no problem understanding and answering questions.
[6] Hawk contends as a subissue of Claim 1 that Madden should have stopped the interview when Hawk made comments that might have been equivocal requests to cut off questioning. This issue has already been decided adversely to the defendant. See State v. Owen, 696 So.2d 715 (Fla.1997) (holding that once a suspect waives his rights, any subsequent invocation must be clear). We find no error.
[7] Evidence of premeditation includes the following: Three days prior to the murder Hawk bragged to friends: "I can, you know, hit old people," "I can fuck them up," and "I could beat up old people"; the medical examiner testified that Betty Gray died from numerous massive wounds to the head consistent with hammer blows; the blood splatter expert testified that the attack occurred while Betty was in bed and her head was on the pillow, and that the attack was so vigorous that blood and hair were splattered throughout the room, including on the walls and ceiling; and several friends testified that in the hours after the murder Hawk bragged about killing someone and displayed the fruits of the crimethe car and wad of billsand indicated that the murder was deliberate.
[8] The allegedly improper statements include the following:

(During the State's opening.) "The evidence will show, ladies and gentlemen, that Robert Hawk is an amoral, vicious, cold-blooded killer."
(When Hawk testified that the Grays had sexually abused him.) "It's just outrageous."
(During the State's penalty phase closing argument.) "While the young oftentimes take life for granted, the elders of any society appreciate that life is finite and only have so much to make their mark in this world. The events of February 18th and 19th of 1993 saw a tragic clash of these two views of life. Betty Hawk and her husband Matthew, on one hand, in their '60s, retired, living the life of simple joys, going to bingo halls put on by the deaf community. Robert Hawk, on the other hand, in his 18 years had been nothing but a high school dropout, unemployed, living off his parents' couch and out of their refrigerator."
(During the State's penalty phase closing argument.) "While those aggravating factors are very real and oh so tragic, the mitigating factors are nothing but pathetic excuses to explain away the actions of a savage killer. That savage killer sits before you in this courtroom, Robert Hawk."
(During the State's penalty phase closing argument.) "But if you go back there and you think that for some reason, because Robert Hawk is deaf and for that reason alone that this case merits a life recommendation in spite of all the aggravating factors, then that recommendation is an insult to all who have achieved greatness and lived law abiding and productive lives in spite of the same handicap."
[9] See Esty v. State, 642 So.2d 1074 (Fla.1994) (finding no error where the court instructed the jury to disregard a "dangerous, vicious, cold-blooded murderer" comment).
[10] In response to the prosecutor's question, "Do you know Robert Hawk?" Matthew said, "Yes. Yes. Yes. He stole." Defense counsel objected, and the prosecutor later asked, "[D]id you ever sexually molest Robert Hawk?" Matthew responded, "No, no, no." and then was excused.
[11] The record shows the following: When police arrived on the scene, the Grays' house showed signs of having been forcibly entered and ransacked, and police found no money in Betty's purse or anywhere in the house; after committing the crimes, Hawk flashed a wad of money to friends and indicated that he had stolen the money after killing someone; Hawk did not customarily carry money wadded in that fashion; and Hawk stole the Grays' car.
[12] Cf. Curtis v. State, 685 So.2d 1234 (Fla.1996) (vacating death sentence for shooting death of store clerk where two aggravatorsincluding attempted murder of second store clerkwere weighed against substantial mitigation including remorse and youth) cert. denied, ___ U.S. ___, 117 S.Ct. 2521, 138 L.Ed.2d 1022 (1997); Morgan v. State, 639 So.2d 6 (Fla.1994) (vacating death sentence for bludgeoning death of homeowner where two aggravators were weighed against copious mitigation including brain damage and youth); Livingston v. State, 565 So.2d 1288 (Fla.1988) (vacating death sentence for shooting death of store clerk where two aggravators were weighed against substantial mitigation including abusive childhood, diminished intellectual functioning, and youth). See also Knowles v. State, 632 So.2d 62 (Fla.1993) (vacating death sentence for shooting deaths of defendant's father and neighborhood child where one aggravator was weighed against substantial mitigation including brain damage and impaired capacity).
[13] Claims 5-7 have already been decided adversely to the defendant. As to Claim 5: see, e.g., Preston v. State, 607 So.2d 404 (Fla.1992) (upholding constitutionality of standard jury instruction on HAC). As to Claim 6: see, e.g., Bowden v. State, 588 So.2d 225 (Fla.1991) (finding no error where court instructed on an aggravating circumstance and later found that circumstance had not been established). As to Claim 7: see In re Standard Jury Instructions, 678 So.2d 1224 (Fla.1996) (explaining that the amendment to section 775.082(1), Florida Statutes (1993), applies only to offenses committed after May 24, 1994).