834 So.2d 836 (2002)
Arthur BARNHILL, III, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-547.
Supreme Court of Florida.
October 10, 2002.
Rehearing Denied December 27, 2002.
*840 James B. Gibson, Public Defender, and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Arthur Barnhill, III. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm both the conviction for first-degree murder and the death sentence.

Procedural and Factual History
Arthur Barnhill, III (Barnhill), was raised by his grandparents after his mother essentially abandoned him and his father was imprisoned. When he was 20 years of age, Barnhill's grandparents asked him to leave the house because Barnhill did not follow their rules. He went to live with the family of his friend, Michael Jackson, a codefendant in this case. He lived with the Jacksons for approximately two weeks before he was asked to leave their home as well. Barnhill decided to go to New York, where his girlfriend lived. To get there, Barnhill planned to steal a car and money from Earl Gallipeau, who was 84 years old. Gallipeau was a lawn service customer of Barnhill's grandfather. Barnhill and Gallipeau met when Barnhill did lawn work for his grandfather at Gallipeau's house.
On Sunday, August 6, 1995, Barnhill and Michael Jackson walked to Gallipeau's house to steal Gallipeau's car. They entered the house through the garage and waited in the kitchen for approximately two hours. Gallipeau was in another room watching television. According to Michael Jackson, it was not until they were in Gallipeau's kitchen that Barnhill revealed his plan to kill Gallipeau before taking the car. At that point, Jackson abandoned the enterprise and left. At least one witness saw Michael Jackson walking alone in Gallipeau's neighborhood away from Gallipeau's house.
When Gallipeau got up from watching television and went into the kitchen, Barnhill ambushed him and attempted to strangle him. When the attempt failed, Barnhill got a towel to use as a ligature around Gallipeau's neck. The second attempt was unsuccessful, so Barnhill removed Gallipeau's belt from around his waist and *841 wrapped it around Gallipeau's neck four times, breaking Gallipeau's neck and killing him. Barnhill then dragged Gallipeau through the house to a back bedroom and left him there.
Barnhill took Gallipeau's money, wallet, keys, and car, and eventually met Jelani Jackson, Michael Jackson's brother. Barnhill and Jelani Jackson drove to New York and Barnhill went to his girlfriend's apartment. Shortly thereafter, New York police located Gallipeau's vehicle, found Barnhill, and arrested him on an old warrant.
Barnhill told police that he was at Gallipeau's house with Jelani Jackson, but that Jelani Jackson actually killed Gallipeau and he only held Gallipeau's hands down to help. This, Barnhill indicated, explained the presence of Gallipeau's blood on his shirt. Barnhill filed a motion to suppress his statement to police and evidence obtained during his arrest, which the trial court denied. Within ten days after the suppression hearing, defense counsel requested a competency hearing for Barnhill. After counsel requested the competency hearing, he filed a motion to disqualify the trial judge based on certain comments made at the suppression hearing. The trial judge denied the motion to disqualify. Barnhill thereafter entered pleas of no contest to first-degree murder, burglary of a dwelling while armed, armed robbery, and grand theft. The trial court made a finding of guilt as to each charge.[1]
Both the State and Barnhill presented testimony and evidence during the penalty phase. The State called twenty-four witnesses, including the medical examiner, Gallipeau's neighbors and housekeeper who called police to investigate after Gallipeau's wallet was found in the street, the police officer who found Gallipeau's body, police officers from New York who arrested Barnhill and questioned Jelani Jackson, and Jelani and Michael Jackson. Barnhill called thirteen witnesses, including various family members and friends who testified to Barnhill's home life, upbringing, and mental and emotional performance. Barnhill called Dr. Eisenstein and Dr. Gutman to testify to his mental health and presented the perpetuated testimony of Dr. Feegel.
The jury recommended death by a vote of nine to three. The trial court then conducted a Spencer[2] hearing, at which Barnhill testified. After considering the jury recommendation action, evidence presented at the penalty phase trial, additional evidence in mitigation presented at the Spencer hearing, including Barnhill's own testimony, memoranda and arguments of counsel, the trial court imposed the following sentence: On count I of the indictment, the trial court sentenced Barnhill to death for the first-degree murder of Gallipeau; on count II, the trial court sentenced Barnhill to life for burglary while armed; on count III, the trial court sentenced Barnhill to life for robbery with a deadly weapon; on count IV, the trial sentenced Barnhill to five years for grand theft. Each sentence was ordered to run concurrently with the sentence of death.
Barnhill raises seven issues on direct appeal: (1) the trial court erred in denying his motion for disqualification; (2) the trial court erred in refusing to strike two jurors for cause who stated they had deep-rooted beliefs in favor of the death penalty; (3) the trial court erred in limiting the defense's *842 relevant voir dire examination by repeatedly interrupting counsel and chastising him in front of the venire; (4) the trial court erred in denying the defense motion for continuance so that the defense could present the live testimony of its expert; (5) the trial court erred in adjudicating and sentencing Barnhill for both the robbery of Gallipeau and the theft of Gallipeau's automobile; (6) the trial court erred in instructing the jury on statutory mitigating circumstances which the defense had waived; (7) the trial court included improper aggravating circumstances, excluded existing mitigating circumstances, and failed to properly find that the mitigating circumstances outweighed the aggravating circumstances. We discuss each of Barnhill's claims below.

ISSUES

1. Motion to Disqualify
Barnhill argues the trial court erred in denying his motion to disqualify the trial judge. We disagree and affirm the ruling that the motion was insufficient. Section 38.10, Florida Statutes (2001), gives litigants the substantive right to seek disqualification of a judge. Rule 2.160, Florida Rules of Judicial Administration, sets forth the procedure to be followed in the disqualification process.
Section 38.10, provides in pertinent part:
Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in favor of the adverse party, the judge shall proceed no further, but another judge shall be designated in the manner prescribed by the laws of this state for the substitution of judges for the trial of causes in which the presiding judge is disqualified. Every such affidavit shall state the facts and the reasons for the belief that any such bias or prejudice exists and shall be accompanied by a certificate of counsel of record that such affidavit and application are made in good faith.
Similarly, rule 2.160 provides in pertinent part as follows:
(d) Grounds. A motion to disqualify shall show:
(1) that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge; or
(2) that the judge before whom the case is pending, or some person related to said judge by consanguinity or affinity within the third degree, is a party thereto or is interested in the result thereof, or that said judge is related to an attorney or counselor of record in the cause by consanguinity or affinity within the third degree, or that said judge is a material witness for or against one of the parties to the cause.
....
(f) DeterminationInitial Motion. The judge against whom an initial motion to disqualify under subdivision (d)(1) is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged. If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action. If any motion is legally insufficient, an order denying the motion shall immediately be entered. No other reason for denial shall be stated, and an order of denial shall not take issue with the motion.
The test a trial court must use in reviewing a motion to disqualify is set forth in MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332 (Fla.1990). In *843 MacKenzie, we held that "the standard for determining whether a motion is legally sufficient is `whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial.'" Id. at 1335 (quoting Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983)). Whether the motion is "legally sufficient" is a question of law. See Id. It follows that the proper standard of review is de novo. See Armstrong v. Harris, 773 So.2d 7 (Fla. 2000); Sume v. State, 773 So.2d 600 (Fla. 1st DCA 2000); Rittman v. Allstate Ins. Co., 727 So.2d 391 (Fla. 1st DCA 1999).
Barnhill's motion to disqualify was based on the trial judge's finding that Barnhill was untruthful when he testified that he was living with his girlfriend in New York. The judge's complete statement is as follows:
There may be reason for a lawsuit where you can sue them [the police] under a 1983 action, there may be grounds for a lawsuit or a motion to suppress for the homeowner who lives there, okay, and I'm not finding by any stretch of the imagination that your client lives there. In fact, I find him to be a totally unbelievable explanation as to what happened. It about borders on perjury, in fact, when you say that somebody's going to be living at a house, they can't tell you who it is that says they live there, either the mother-in-law or, I use the word mother-in-law, the girlfriend's mother and stepfather, can't give me their names, arrives there eleven o'clock at night, says there's a phone call at midnight that says, yes, you can live there. He hasn't been there for quite sometime. Additionally, it's a two bedroom apartment. The way I counted it, there's his girlfriend and three sisters, a baby, a mother and a stepfather, and he says he's gonna live in one of the bedrooms. That's not believable under any stretch of the imagination.
In the motion to disqualify, Barnhill asserts that he has a well-grounded fear that the judge will not be fair and impartial, and that the judge's statements indicate bias against him because the judge denied his motion to suppress despite the fact that the State offered no evidence to contradict Barnhill's testimony that he lived with his girlfriend in New York.
The motion to disqualify is legally insufficient because the supporting affidavit made by the defendant does not state the specific facts which lead him to believe he will not receive a fair trial. The oath that appears in the record merely refers to "the matters, which are contained in this motion." Barnhill did not file an affidavit stating the facts and the reasons for the belief that bias or prejudice exists. Further, the certificate of counsel of record is attached to the motion itself and states only that the statements of the defendant contained "herein" are made in good faith. The motion was technically insufficient, and the trial judge's ruling was correct.
Without discussing the technical requirements, Barnhill argues that the motion was legally sufficient because the grounds upon which the motion was based were legally sufficient. Barnhill cites several cases where the judge's commentary on the truthfulness of a witness affected the outcome of the trial and warranted disqualification. Whether that is true or not, the technical requirements of the motion were not met and the trial court's decision to deny the motion as legally insufficient was proper.

2. Failure to Strike Jurors
Barnhill next asserts that the trial court erred in refusing to excuse at least two jurors for cause, forcing him to use his peremptory challenges to remove them. He claims, without elaboration, there were *844 other jurors he would have moved to strike and could not because he was out of challenges. Barnhill specifically argues that jurors Cotto and Robinson should have been stricken for cause because they both expressed strong bias in favor of the death penalty. The trial court asked the two jurors whether they could follow the law and they both responded that they could. Barnhill argues that the court asked a much more general question than what he would have asked, and simply saying they could follow the law is not enough to rehabilitate a juror.
The test for determining juror competency is whether the juror can set aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995). A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror incompetency. See Pentecost v. State, 545 So.2d 861 (Fla. 1989). The decision to deny a challenge for cause will be upheld on appeal if there is competent record support for the decision. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997); Johnson v. State, 660 So.2d 637 (Fla.1995). In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record. See Smith v. State, 699 So.2d 629, 635-36 (Fla.1997); Taylor v. State, 638 So.2d 30, 32 (Fla.1994). It is the trial court's duty to determine whether a challenge for cause is proper. Id. In a death penalty case, a juror is only unqualified based on his or her views on capital punishment, if he or she expresses an unyielding conviction and rigidity toward the death penalty. See Farina v. State, 680 So.2d 392 (Fla.1996).
Barnhill argues that Cotto and Robinson were not rehabilitated by the judge's simple question regarding whether they could apply the law, despite their statements otherwise, because of their unequivocal answers to other questions in voir dire.
The following is the exchange with Cotto:
STATE: Mr. Cotto, what do you feel about the death penalty?
COTTO: I strongly agree with the death penalty. I think if you kill you should be executed.
STATE: Okay. Well, Florida law doesn't quite agree with you on that, it weighs out circumstances when it should and when it should not and things to consider and weigh out that way in making your decision, it's not all the time. Can you set aside your opinions and follow what the law says?
COTTO: Yes, I could.
STATE: Even if it lead [sic] you to saying no death penalty in this case?
COTTO: Yes, I could.
As for Cotto, there was no wavering and no indication from his statements that he was equivocating. Cotto did not express unyielding conviction and rigidity toward death penalty. Because there is support in this record, we uphold the trial court's decision to deny Barnhill's challenge for cause of juror Cotto. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997). The testimony supports the trial court's decision, and in view of the trial court's ability to assess Cotto's demeanor and honesty in *845 answering the questions, we find that the trial court's judgment was proper.
As for Robinson, the exchange went as follows:
DEFENSE: Ms. Robinson, okay. The same question, you've heard the reading of the indictment here and you can consider what I've said about the weighing process to be consistent with the law of Florida. Do you feel that you're inclined to favor one sentence versus the other at this point? And as Ms. Schwartz pointed out it's somewhat backwards, you haven't heard the facts yet but you're going to
ROBINSON: I do tend to favor the death penalty in murder cases. But I'm more than willing to listen and I'm not head strong enough that I wouldn't listen to what is being said and consider the life imprisonment.
DEFENSE: Okay. So you would be inclined to give greater weight, you think, to aggravating circumstances because you favor the death penalty than you would be to give to mitigating circumstances, generally speaking?
ROBINSON: Yes.
COURT: We're going to stop it right now. Counsel approach the bench. (Whereupon, a benchside conference was held out of the hearing of the Venire as follows:)
At the benchside conference, the court told counsel that he needed to explain aggravating and mitigating factors before asking a juror how he or she would weigh the factors and pointed out that a juror may not know what these terms mean. The judge then addressed the panel as follows:
COURT: Ladies and Gentlemen of the panel, do you understand my instructions on the law in this case, do all of you understand that?
VENIRE: Yes.
COURT: Is there anybody at this point in time just because there has been entry of the plea set forth in the indictment that feel they're more predisposed because that finding had been made to favor the death penalty then not favor the death penalty? Is there anybody who's of that mind set at this time?
VENIRE: No.
COURT: We have one, if you will, please raise your hand. Mr. Lowe, I see your hand raised. Anybody else?
....
Okay, thank you. You may continue.
DEFENSE: Mr. Chenet, I'm back to you now, ....
Barnhill argues that the court did not adequately rehabilitate Robinson after she indicated that she believed in the death penalty and had her own opinions as to when it should be imposed. This argument ignores the fact that Robinson also said that despite her feelings, she was more than willing to listen to the evidence and would consider life imprisonment based on what she heard. "[J]urors who have expressed strong feelings about the death penalty nevertheless may serve if they indicate an ability to abide by the trial court's instructions." Johnson v. State, 660 So.2d 637, 644 (Fla.1995) (citing Penn v. State, 574 So.2d 1079 (Fla.1991)). Again, the trial court is given broad discretion to determine whether a prospective juror is qualified to serve based on the juror's demeanor and attitude about whether he or she will follow the law. Appellate courts are disinclined to reverse this decision based on a cold record. See Johnson, 660 So.2d at 644.
*846 Because there is competent support in the record for the trial judge's decision, we deny Barnhill's claim.

3. Voir Dire
Barnhill raises two issues concerning voir dire questioning: (1) he complains that he was deprived of a fair trial because the trial judge unreasonably limited defense counsel's voir dire and thereby deprived him of the right to a fair and impartial jury; and (2) the trial judge lacked neutrality as evidenced by his unreasonable limitations and restrictions on defense counsel's voir dire, his repeated interruptions, chastising counsel and threatening to replace counsel, and the fact that the trial judge took over defense counsel's questioning. The State argues that the trial judge did not abuse his discretion because he interrupted both sides, did not restrict the defense's voir dire, and only questioned jurors to clarify certain points because defense counsel's inquiries were rambling, disjointed and confusing. Voir dire examination has been explained thusly:
The examination of a juror on his voir dire has a two fold purpose, namely, to ascertain whether a cause for challenge exists, and to ascertain whether it is wise and expedient to exercise the right of peremptory challenge given to parties by the law....
... [F]ull knowledge of all material and relevant matters is essential to the fair and just exercise of the right to challenge either peremptorily or for cause.
Loftin v. Wilson, 67 So.2d 185, 192 (Fla. 1953) (quoting Pearcy v. Mich. Mut. Life Ins. Co., 111 Ind. 59, 12 N.E. 98, 99 (1887)). If counsel knows nothing more of the jurors, the single thing defense counsel must ascertain is whether the prospective jurors can fairly and impartially consider the defense offered by the defendant. See Lavado v. State, 492 So.2d 1322 (Fla.1986). A trial judge abuses his or her discretion if he or she precludes counsel from asking specific questions about bias or prejudice against the defendant or the defense theory, even if the judge permits the general question as to whether the prospective juror can follow the law. Id.
The issue here is whether the trial judge's actions amount to a denial of defense counsel's right to question the prospective jurors as to any bias or prejudice against Barnhill or his defense strategy. While it is true that the judge asked the prospective jurors whether they were predisposed to the death penalty because the defendant pled guilty, before he did so, defense counsel questioned the jurors about whether they were biased against the defendant because of his plea. Defense counsel attempted to find out if the venire was biased, but the questions were long and compound. The court called defense counsel up to the bench twice and several times tried to re-ask the questions about bias as the court understood them in an attempt to clarify the questions.
The record in this case indicates the trial court did not unreasonably limit defense counsel's voir dire. The trial judge was trying to help defense counsel focus in on the questions defense counsel was trying to ask. At no time did the court say that defense counsel could not explore the issue of bias. Although the court conditioned this line of inquiry on counsel providing a clear recitation of the entire law on mitigation and aggravation, there was no bar or limit to the actual questioning.
As to Barnhill's allegation that the trial judge lacked neutrality by unreasonably limiting and restricting defense counsel's voir dire because he repeatedly interrupted, chastised, and threatened to replace counsel and improperly took over *847 defense counsel's questioning, the record shows otherwise. Defense counsel's own testimony during his motion to strike the panel is that he was called to the bench twice. It was during one of the bench conferences that the judge told defense counsel if he did not make his questions more comprehensible, co-counsel would have to continue for him. The warning was at benchside, and not before the jury. Although defense counsel argued that he "felt a bad vibe" from the prospective jurors after he was called to the bench, and this was the basis of his motion to strike, the judge disagreed and said the panel's attitude was more likely from the questioning than from the judge's actions.
Based on the record, we cannot say that the judge abused his discretion. The court's rationale for calling the attorneys to the bench, conditioning defense counsel's questions, and questioning the panel himself was reasonable given the circumstances.

4. Motion for Continuance
Barnhill also argues the trial court erred in denying his motion for a continuance. In Kearse v. State, 770 So.2d 1119, 1127 (Fla.2000), we stated that the trial court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. We further stated:
An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to defendant. See Fennie v. State, 648 So.2d 95, 97 (Fla.1994). This general rule is true even in death penalty cases. "While death penalty cases command [this Court's] closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance."
Id. (quoting Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976)). Even if the trial court abused its discretion in denying the motion, Barnhill must also show that the trial court's denial was harmful; the harmless error doctrine is applicable in these situations. See Richardson v. State, 604 So.2d 1107, 1108 (Fla.1992) (citing State v. DiGuilio, 491 So.2d 1129 (Fla.1986)) (trial court should have granted defendant's request for continuance, but under circumstances, the error was harmless).
Barnhill sought a continuance at trial because his expert witness, Dr. Feegel, was unable to appear and testify personally due to an unforseen medical emergency. Defense counsel wanted to use him at trial as a live witness to testify as to the length of time it would take for a person to lose consciousness from strangulation. Such testimony would be relevant to negate a finding that the crime was especially heinous, atrocious, or cruel (HAC). The State's expert, Dr. Gore, planned to rebut with testimony that it could have been up to seven minutes before a victim would lose consciousness from strangulation and in this case several minutes may have passed before the victim lost consciousness. Defense counsel argued that even if Dr. Feegel's testimony was perpetuated, without his presence it would be impossible for the defense to reply.
The State opposed the motion, arguing that the case was continued many times and the penalty phase was originally set almost a year prior. The State also had several out-of-state witnesses to schedule, including the New York police officers who were involved in Barnhill's arrest. The State suggested that the defense could get another expert to present the same type of testimony.
The trial court asked defense for case law, but the defense did not present any, *848 relying on good cause. The trial court suggested perpetuating Dr. Feegel's testimony and denied the motion for continuance. To protect the defense's ability to present surrebuttal, the court ordered the deposition of Dr. Gore, the State's expert, for his response to Dr. Feegel's testimony.
At trial, Dr. Gore testified that the victim's stained shorts could have been caused by urinating out of fear. Dr. Feegel did not anticipate this statement in his videotaped testimony and therefore did not address it. The defense now argues it was prejudiced because had the continuance been granted, and had Dr. Feegel been present to testify in person, he could have replied to the statement.
Although Dr. Feegel's videotaped testimony did not address the urination issue, his affidavit concerning the matter was presented to the trial judge at the Spencer hearing. Thus, the trial judge was presented Dr. Feegel's rebuttal of the disputed evidence. Additionally, the trial court did not rely on the fact that Gallipeau may have lost control of his bladder in finding the existence of the heinous, atrocious or cruel aggravating circumstance. Even without this particular testimony from either expert, there is enough evidence to support a finding of HAC. The trial court did not err in denying the motion for a continuance.

5. Double Jeopardy Claim
Barnhill argues that the robbery of Gallipeau by forcibly taking his keys and the theft of his car were one criminal episode and that conviction of both these crimes places him in double jeopardy. We recently resolved this issue in Hayes v. State, 803 So.2d 695 (Fla.2001). In Hayes, the defendant was convicted of armed robbery (by the taking of keys) and grand theft (of the car). Like Barnhill, the defendant in Hayes argued the convictions violated double jeopardy because the incidents arose out of a single criminal episode. Like the defendant in Hayes, Barnhill first entered the victim's residence and robbed the victim of various items inside the residence, including the victim's money, wallet, the contents of the wallet, and the keys to the victim's motor vehicle. At that time, the robbery was complete. Barnhill exited the home and proceeded to steal the victim's motor vehicle. Only upon the taking of the vehicle did the grand theft of the motor vehicle occur, thus separating the taking of the motor vehicle in time, place, and circumstance from the crime of robbery, and constituting a distinct and independent criminal act. Therefore, double jeopardy does not prohibit multiple convictions. See Hayes v. State.

6. Waived Jury Instruction
Barnhill next asserts that he waived the presentation of statutory mental mitigation to the jury. Specifically, Barnhill argues, he waived the words "extreme" and "substantial" in the standard jury instructions for statutory mental mitigation. Barnhill argues that (1) he did not want an instruction on whether he "acted under extreme duress or under the substantial domination of another," and (2) he did not want the court to read the instruction that discussed the issue of whether his capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of law was substantially impaired. But if the instruction was read, Barnhill wanted it read without the word "substantially."
In support, Barnhill relies on Maggard v. State, 399 So.2d 973 (Fla. 1981), for the proposition that if a defendant does not rely on specific mitigation, the State may not present evidence to rebut it. That is not the situation in this case. Barnhill presented evidence of mitigation *849 as to duress and domination, but he admittedly did not believe the evidence rose to the level of "extreme duress" and "substantial domination." He wanted to waive the instruction altogether or at least remove the words "extreme" and "substantial" from the standard instruction.
Neither the defense nor the State may waive any instruction so long as there is evidence to support it. "Where, as here, evidence of a mitigating or aggravating factor has been presented to the jury, an instruction on the factor is required." Bowden v. State, 588 So.2d 225, 231 (Fla.1991) (citing Stewart v. State, 558 So.2d 416, 420 (Fla.1990)).
If the advisory function [of the jury] were to be limited initially because the jury could only consider those mitigating and aggravating circumstances which the trial judge decided to be appropriate in a particular case, the statutory scheme would be distorted. The jury's advice would be preconditioned by the judge's view of what they were allowed to know.
Stewart, 558 So.2d at 421 (emphasis removed) (quoting Floyd v. State, 497 So.2d 1211, 1215 (Fla.1986)).
We have also rejected the argument that the words "substantial" and "extreme" should or even could be removed from the standard instructions. We have said that the argument in favor of modifying the standard jury instructions on mental mitigators to eliminate adjectives such as "extreme" and "substantially,"
rests on a fundamental misconception of Florida law. Statutory mental mitigators are distinct from those of a nonstatutory nature, and it is the latter category that Johnson's revised jury instruction attempted to recast in "statutory" terms. This in effect asked the trial court to rewrite the statutory description of mental mitigators, which is a violation of the separation of powers doctrine. Art. II, § 3, Fla. Const. Nonstatutory mental mitigators are addressed under the "catch-all" instruction, as happened here.
Johnson v. State, 660 So.2d 637, 647 (Fla. 1995) (citing Walls v. State, 641 So.2d 381, 389 (Fla.1994)).
In this case, the jury was instructed on the statutory mental mitigators and the "catch-all" mitigator. The trial judge considered this evidence as nonstatutory mitigation. Error has not been demonstrated.

7. The Sentence
Lastly, Barnhill argues the trial court found improper aggravating circumstances, failed to consider or gave little weight to relevant mitigating circumstances, and improperly found that the aggravating circumstances outweighed mitigating circumstances. Barnhill's argument is a four-step approach. First he argues that the heinous, atrocious, or cruel (HAC) aggravating factor and the cold, calculated, and premeditated (CCP) aggravating factor were improperly found. He then argues there was improper doubling of the pecuniary gain aggravator and "during the course of a felony" aggravating factors. Barnhill next argues that the mitigating factors were not given their proper weight. Finally, he argues that the sentence was not proportional.

Aggravators
HAC
Barnhill argues that HAC was improperly found under the circumstances of this case. The HAC aggravating factor applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. See Williams v. State, 574 So.2d 136 (Fla.1991). HAC focuses *850 on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. See Brown v. State, 721 So.2d 274, 277 (Fla.1998). Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference. See id. Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC. See Mansfield v. State, 758 So.2d 636, 645 (Fla.2000); Orme v. State, 677 So.2d 258, 263 (Fla.1996).
Although the evidence is unclear exactly how long Gallipeau was conscious before he was killed, we only consider whether there is competent, substantial evidence to support the trial judge's finding. In the sentencing order, the trial judge found HAC based on the following facts: the victim was 84 years old; Barnhill stalked the victim in his own home; Barnhill struck him in the head and drove him to the ground and began to manually strangle him; the victim was forced to view Barnhill and knew who he was; the victim had always shown Barnhill kindness and generosity; Barnhill failed to manually strangle the victim so he got a towel to use as a ligature; and the towel was ineffective, so Barnhill took the victim's belt from his pants and wrapped it around the victim's neck four times. The trial judge further found that the victim never regained consciousness from the initial attempt at manual strangulation.
The trial judge relied on Barnhill's description of the strangulation and said it took six or seven minutes to strangle the victim. The trial judge also relied on Barnhill's statement that the victim struggled and fought and tried to yell for help. The trial judge relied on these facts because they were corroborated by other evidence in the record. A trial judge is not prevented from relying on specific statements made by the defendant if they have indicia of reliability, even if the defendant has given several conflicting statements. See Hildwin v. State, 531 So.2d 124, 128 n. 2 (Fla.1988). Consistent with Barnhill's rendition, the medical examiner testified that the victim lost consciousness within one to two minutes after being manually strangled, and would have died within one to seven minutes. This evidence demonstrates that the victim was aware of his impending death. See Capehart v. State, 583 So.2d 1009 (Fla.1991) (HAC applies where victim's death was painful, and where the smothering was not instantaneous because the victim remained conscious for two minutes).
The trial judge reasonably found that the victim suffered a physically and mentally cruel, torturous death. See Mansfield, 758 So.2d at 645. Barnhill focuses on his own intent to strangle the victim quickly. As stated above, HAC focuses on the means and manner in which the death is inflicted, not the intent and motivation of a defendant. See Brown v. State, 721 So.2d 274, 277 (Fla.1998). The record supports the trial court's finding of HAC.
CCP
Barnhill next argues that the trial judge improperly found CCP, asserting there was no evidence of a preconceived plan to kill and that Barnhill's emotional disturbance negates CCP. As stated above, the trial judge's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence *851 in the record. See Almeida v. State, 748 So.2d 922, 933 (Fla.1999); Willacy v. State, 696 So.2d 693 (Fla.1997). To find CCP,
the jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). In support of CCP, as set forth in the sentencing order, the trial judge found that after Barnhill decided to steal the victim's car, he devoted an exceptional amount of time and effort in traveling to the victim's house. Barnhill entered the victim's house, concealed himself, and observed the victim while plotting his course of action. While inside the victim's house, Barnhill could have simply stolen the keys and wallet, which were on the table in the doorway. The killing was not simple. Barnhill had the time and opportunity to reflect upon his actions before the first strangulation was attempted, before the towel ligature was employed, and again before the belt was used. He was in the house for approximately two hours before attempting the strangulation.
The crime was calculated.
In addition, Barnhill told his accomplice, Michael Jackson, what he planned to do with enough advance warning that Jackson was able to leave the home. Barnhill spent approximately two hours in the victim's house, which demonstrates a prearranged design to kill the victim. As for Barnhill's mental state, CCP may be found despite the existence of mental mitigation. See Robinson v. State, 761 So.2d 269 (Fla. 1999) (affirming death penalty with pecuniary gain, HAC, and CCP aggravators, both statutory mental mitigators, and eighteen nonstatutory mitigators). There was competent and substantial evidence in the record to support the trial court's finding of CCP, and we affirm the trial court's order in this respect.

Improper Doubling
Barnhill next argues that the trial court improperly doubled the aggravating circumstances that Barnhill committed the murder (1) for pecuniary gain, and (2) during the course of a felony (robbery or burglary aggravators), citing Campbell v. State, 571 So.2d 415, 418 (Fla.1990), and Provence v. State, 337 So.2d 783, 786 (Fla. 1976).
Generally, when a homicide occurs during the course of a robbery, the court cannot find both that the homicide was committed during the course of a robbery and that the homicide was committed for pecuniary gain. Doubling of aggravating circumstances is improper where the circumstances refer to the "same aspect" of the crime. See Provence v. State, 337 So.2d at 786. Both aggravators may be found if there are two or more enumerated felonies committed during the course of a homicide, and one involves obtaining money (e.g., robbery), and one does not involve obtaining money (e.g., sexual battery or kidnapping). See Willacy v. State, 696 So.2d 693 (Fla.1997). But where two aggravating factorsin this situation, that the capital felony was committed in the course of a burglary and that it was committed for pecuniary gainare based on the same aspect of the criminal episode, they should be considered a single aggravating circumstance. See Cherry v. State, 544 So.2d 184 (Fla.1989) (citing Mills v. State, 476 So.2d 172 (Fla.1985) (Mills broke into the house intending to steal *852 something and when the victim woke up, Mills shot and killed him)).
In this case, the trial court found that the murder was committed while Barnhill was engaged in the commission of a robbery or burglary. The facts upon which the trial court relied to establish this aggravator included Barnhill's plea of no contest, the videotaped confession that Barnhill broke into the house intending to steal the car and money, the testimony of Michael Jackson, and DNA evidence taken from the victim's blood found on Barnhill's clothing.
The trial court also found that the felony was committed for pecuniary gain. The facts relied upon included the following: Barnhill pled no contest; Barnhill confessed he was in possession of several hundred dollars of the victim's funds; Barnhill drove the victim's car immediately after the murder and had a large sum of money with him; and Barnhill had a motive for the murder, which was the theft of the victim's car, wallet, and money.
The trial court relied upon the same aspects of Barnhill's crime in finding the "pecuniary gain" aggravator and the "in the course of a felony" aggravator. This constitutes an improper doubling, and the pecuniary gain aggravator should be stricken.

Mitigators
Barnhill also argues that the court improperly denied a finding of certain statutory mitigators and improperly weighed certain nonstatutory mitigators. Specifically, Barnhill argues that the trial judge failed to give proper consideration to his age at the time of the crime (he was 20) and the fact that he was emotionally and psychologically immature. It is within the sentencing judge's discretion to determine the relative weight to give to each established mitigator, and that ruling will not be disturbed if supported by competent, substantial evidence in the record. See Spencer v. State, 691 So.2d 1062, 1064 (Fla.1996); Johnson v. State, 660 So.2d 637, 646 (Fla.1995). Where a defendant is not a minor, no per se rule exists to pinpoint a particular age as an automatic factor in mitigation. See Shellito v. State, 701 So.2d 837, 843 (Fla.1997). Instead, the trial judge is to evaluate the defendant's age based on the evidence adduced at trial and at the sentencing hearing. See id. We have held that the trial judge is in the best position to determine a non-minor defendant's emotional and maturity level, and we will not second-guess the judge's decision to accept age in mitigation and assign it only slight weight. See Shellito, 701 So.2d at 844. Therefore, the trial court's findings with respect to Barnhill's age at the time of the crime will not be disturbed.
Barnhill argues the other factors in mitigation involving Barnhill's emotional immaturity, intellectual immaturity, behavioral immaturity, frontal lobe impairment, and learning disabilities were entitled to great weight rather than little weight. He also argues the trial judge erred when he considered Barnhill's learning disability and gave it little weight.
In regard to Barnhill's frontal lobe impairment, the trial judge considered Dr. Eisenstein's testimony in favor of Barnhill, as well as the testimony of Dr. Gutman, who disagreed as to the existence of this condition. Both experts agreed that because of Barnhill's poor performance on a psychological test, the MMPI, a determination of whether he suffers frontal lobe impairment is open to broad interpretation. Based on this conflicting expert testimony, the trial court found that Barnhill suffers from frontal lobe impairment, but gave that factor little weight.
*853 With regard to Barnhill's difficult childhood, the trial court found this factor to exist, but gave it little weight because Barnhill was not without moral guidance in his early years; his grandparents and other family members assisted and supported him. As for Barnhill's psychiatric disorders, again the trial court found this factor to exist, but gave it little weight. The trial court stated that the expert evidence for both the State and for Barnhill indicates Barnhill is a shy, moderately depressed individual with a low-average IQ. Neither expert was able to give a specific diagnosis of an actual personality disorder.
In arguing improper consideration of mitigating circumstances, Barnhill relies on Hawk v. State, 718 So.2d 159 (Fla.1998); Carter v. State, 560 So.2d 1166 (Fla.1990); Hall v. State, 541 So.2d 1125 (Fla.1989); and State v. Sireci, 502 So.2d 1221 (Fla. 1987). All these cases are distinguishable.
In Hawk, the defendant suffered from meningitis as a child, and it was undisputed that this caused numerous problems with his nervous system and rendered him deaf. The defendant testified to being under the influence of alcohol and drugs at the time of the offense and remembering nothing. The defendant's expert further opined that psychoactive substances tend to exacerbate existing mental illnesses. Finally, the defendant's mother started taking the defendant to psychologists at the age of five as the defendant had poor impulse control even as a child. From this evidence, the Court found that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
In Carter, there was no conflicting expert testimony as to the defendant's mental condition. The defendant suffered incurable organic brain damage as a result of being beaten as a child and suffered other severe head injuries. The defendant also had a history of drug abuse, and may have been substantially intoxicated at the time of the murder. The jury recommended a life sentence. The trial judge nevertheless found no mitigating factors to weigh against five aggravating factors, and overrode the jury's recommendation of a life sentence. We reversed the jury override on appeal, finding that the mitigation was sufficient to support the jury's recommendation. This case, however, did not involve a jury override situation, and the expert testimony regarding mental health mitigation was conflicting.
In Hall, the judge prevented the jury from hearing substantial mental health mitigation. We detailed the mental health mitigation and found that because of the substantial nature of the mitigation, the jury should have heard it and might have recommended a life sentence. There is no allegation that the judge in this case prevented the jury from hearing any of the mitigation. Therefore, this case is inapplicable. Additionally, in Sireci, the issue was whether counsel was ineffective for using and relying on two psychiatric experts whose examinations of the defendant were incompetent. There is no discussion of the weight to be given to mental mitigation.
Because the trial judge has discretion to determine the relative weight to give to each established mitigator, and that ruling will not be disturbed if supported by competent, substantial evidence in the record, Spencer v. State, 691 So.2d 1062, 1064 (Fla.1996); Johnson v. State, 660 So.2d 637, 646 (Fla.1995), and because the judge's sentencing order shows that he relied on competent, substantial evidence, we reject Barnhill's arguments concerning the weight to be given the mitigators.

*854 Proportionality

In every death penalty case, "[t]his Court performs proportionality review to prevent the imposition of `unusual' punishments contrary to article I, section 17 of the Florida Constitution." Sexton v. State, 775 So.2d 923, 935 (Fla.2000). In deciding whether death is a proportional penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See id. at 936 (citing Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998)). Comparing the circumstances in this case to circumstances in other cases where the death penalty has been imposed, the sentence in this case is proportional.
The trial court found five aggravating factors: (1) Barnhill was previously convicted of a felony, and was under a sentence of imprisonment or placed on community control or on felony probation; (2) the capital felony was committed while Barnhill was engaged in the commission of a robbery or burglary; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was a homicide and committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification; and (5) the capital felony was especially heinous, atrocious or cruel. The pecuniary gain aggravator has been merged with the commission of a robbery or burglary aggravator, making four aggravating circumstances.
The following statutory mitigators were considered: (1) Barnhill's age at the time of the crime: little weight; (2) the crime was committed when Barnhill was under the influence of extreme mental or emotional disturbance: considered but not found; (3) Barnhill was an accomplice, but the offense was committed by another person, and Barnhill's participation was relatively minor: not proven; (4) Barnhill acted under extreme duress or under substantial domination of another person, namely Jelani Jackson, who Barnhill claims was the actual murderer: not proven; and (5) the capacity of Barnhill to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired: not proven.
The following nonstatutory mitigators were considered: (1) Barnhill suffers from a learning disability: proven and given little weight; (2) Barnhill has frontal lobe impairment: proven and given little weight; (3) Barnhill cooperated with law enforcement: not proven and not considered; (4) Barnhill had a difficult childhood: proven and given little weight; (5) Barnhill entered a plea, eliminating the need for a guilt phase trial: proven and given little weight; (6) Barnhill manifested appropriate courtroom behavior throughout the penalty phase: proven and entitled to little weight; (7) Barnhill suffers from psychiatric disorders: proven and given little weight; (8) Barnhill feels remorse for the homicide: proven and given little weight; (9) aspects of Barnhill's character and background, such as that he was neglected by his mother, was a poor student, suffered shock and embarrassment because his father was arrested in front of him and his father was sentenced to a lengthy prison stay; lived with his grandparents who provided him with a loving atmosphere: considered and given little weight; and (10) as to any other mitigating factors, Barnhill's comparative culpability as an accomplice: not proven.
We have affirmed death sentences where there existed similar aggravating circumstances and the same type of mitigating circumstances. In Spencer v. State, 691 So.2d 1062 (Fla.1996), the trial court sentenced the defendant to death after finding two aggravating circumstances (prior conviction for a violent felony and *855 HAC), two mental heath mitigators, and a number of nonstatutory mitigators (drug and alcohol abuse, paranoid personality disorder, sexual abuse by his father, honorable military record, good employment record, and the ability to function in a structured environment). Additionally, in Foster v. State, 654 So.2d 112 (Fla.1995), we affirmed a sentence of death where the trial court found the three aggravating circumstances of HAC, CCP, and murder committed during the course of a robbery. The trial court also found fourteen nonstatutory mitigating circumstances, including mental or emotional disturbance that was not extreme and an impaired ability to conform his conduct to the requirements of law that was not substantial. And in Lawrence v. State, 698 So.2d 1219 (Fla.1997), we found a death sentence proportional where there were three strong aggravators (HAC, CCP, and under sentence of imprisonment), weighed against five nonstatutory mitigators (a learning disability, a low IQ, a deprived childhood, the influence of alcohol, and a lack of a violent history). See also Johnson v. State, 660 So.2d 637 (Fla.1995) (death sentence proportional where the trial court weighed and considered the aggravating circumstances of HAC, prior violent felony, murder committed for financial gain, and fifteen mitigating circumstances including mental illness not sufficient to be a statutory mitigator).
The sentence of death in this case is proportional.

CONCLUSION
For the reasons stated above, we affirm both the conviction for first-degree murder and the sentence of death.
It is so ordered.
ANSTEAD, C.J., SHAW, WELLS, PARIENTE, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
NOTES
[1] The facts and evidence are sufficient to demonstrate first-degree murder and Barnhill's participation as a principal.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993). At a Spencer hearing the defendant is allowed to present additional mitigating evidence to the trial judge.