698 So.2d 1219 (1997)
Gary LAWRENCE, Appellant,
v.
STATE of Florida, Appellee.
No. 85725.
Supreme Court of Florida.
August 28, 1997.
*1220 Nancy Daniels, Public Defender, Second Judicial Circuit; and Steven L. Seliger, Special Public Defender of Garcia & Seliger, Quincy, for Appellant.
Robert A. Butterworth, Attorney General and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
SHAW, Justice.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Gary Lawrence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Shortly after Gary and Brenda Lawrence were married, they separated, and another man, Michael Finken, moved in with Brenda and her two daughters, Stephanie and Kimberly Pitts, and Stephanie's friend, Rachel Matin. On the day of the murder, July 28, 1994, Gary and Michael drove Brenda to work and then drank beer at a friend's house. Later, Gary and Michael picked Brenda up and the three returned to the friend's house where they drank more beer. After the three returned to Brenda's apartment, Gary and Michael argued and Gary hit Michael when he learned that Michael had been sleeping with Brenda. Gary and Michael seemed to resolve their differences, and Michael fell asleep on the couch. Gary and Brenda conversed, and Brenda went through the house collecting weaponsincluding a pipe and a baseball bat. Gary and Brenda told Kimberly and Rachel that they were "going to knock off Mike." Gary told Kimberly to "stay in your bedroom no matter what you hear."
The trial court described what happened after Gary and Brenda spoke to the girls:
Thereafter, the two girls heard what they described as a pounding sound. At one point, Rachel Matin stated that she heard the victim say, "stop it, if you stop, I'll leave." She stated that she heard that statement several times. Kimberly Pitts stated she heard the victim say "please don't hit me, I'm already bleeding." The victim's pleas, however, were met with more pounding. Once the pounding stopped, the girls were required to assist in the clean up and described to the jury what they observed. Kimberly stated that much of the victim's right side of his face was missing and his chin was knocked over to his ear. Rachel Matin stated that there was no skin left on the victim's face and part of his nose was missing. Apparently the victim was still alive. Kimberly observed her mother coming out of the kitchen area with what appeared to be a dagger and then, although not seeing the dagger in her hand at the time, observed her mother make a stabbing motion toward the victim with something in her hand.
It was at that time when Brenda Lawrence requested that the girls obtain the assistance of Chris Wetherbee. Upon his entrance into the home, Cris Wetherbee observed the victim's head being caved in, blood all over, the victim's eyeball protruding approximately three inches and a mop handle shoved into the victim's throat. Wetherbee asked Gary Lawrence, "what's going on?" At which time the Defendant responded by pulling out the mop handle and kicking the victim and making the statement "this is what's going on." Immediately after removing the mop handle from the victim's throat, Wetherbee heard the victim give approximately three or four ragged breaths at which time the victim thereafter stopped breathing and apparently expired. The Defendant, Gary Lawrence, told Wetherbee that he had beat him with a pipe until it bent and then beat him with a baseball bat.
Chris Wetherbee summarized the victim's state: "And [he] looked like something off of one of the real good horror movies." Gary and Brenda then removed a small amount of money from Michael's pockets, wrapped the body in a shower curtain and placed the body in Michael's car, and Gary drove to a secluded area where he set the body afire. When Gary returned home, he and Brenda danced.
Gary Lawrence was arrested later that evening driving Michael's car and subsequently confessed, admitting that he had beaten Michael because Michael had been sleeping with Brenda. Lawrence was charged with first-degree murder, robbery, grand theft of a motor vehicle, and conspiracy *1221 to commit murder. At trial, the medical examiner testified as follows: Michael died of blunt trauma and possible asphyxia; Michael was alive when the mop handle was thrust down his throat; Michael's blood alcohol level was very high; and one or more of the blows to Michael's head could have caused loss of consciousness. Lawrence was convicted of first-degree murder, conspiracy to commit murder, auto theft, and petty theft.
During the penalty phase, Lawrence presented testimony of a brother, a psychologist, and a psychiatrist. The court followed the jury's nine-to-three vote and imposed a sentence of death based on three aggravating circumstances,[1] no statutory mitigating circumstances, and five nonstatutory mitigating circumstances.[2] Lawrence also was sentenced to concurrent five-year terms of imprisonment on the conspiracy and auto theft charges and time served on the petty theft charge. (Brenda was tried separately and sentenced to life imprisonment for her role in the crimes.) Lawrence raises seven issues on appeal.[3]
Lawrence first claims that his death sentence is disproportionate to other death penalty cases. We disagree. Three strong aggravating circumstances are arrayed against five nonstatutory mitigating circumstances. We have upheld the death penalty in comparable cases. See, e.g., Johnson v. State, 660 So.2d 637 (Fla.1995) (death sentence upheld where three aggravating circumstances were arrayed against fifteen nonstatutory mitigating circumstances), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Johnson v. State, 660 So.2d 648 (Fla.1995) (same), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Finney v. State, 660 So.2d 674 (Fla. 1995) (death sentence upheld where three aggravating circumstances were arrayed against five nonstatutory mitigating circumstances), cert. denied, ___ U.S. ___, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996). Further, this was an extraordinarily brutal crime. We find the death sentence proportionate.
Lawrence next claims that the murder was not committed in a cold, calculated, and premeditated manner. We disagree. The record contains competent substantial evidence to support the trial court's finding of heightened premeditation. Lawrence and Brenda conversed with each other and then told Rachel and Kimberly to go into Kimberly's bedroom. The adults later entered the room and told the girls that they "were going to knock off Mike." Lawrence told them to stay in the bedroom and not to come out no matter what they heard. Lawrence and Brenda removed a metal pipe and baseball bat from the bedroom, and the girls then heard pounding noises from the living room and Finken pleading. Lawrence beat Finken with the pipe until it bent and then beat him with the bat. Brenda came back into the bedroom and said that they could not "knock Mike off for nothing." Finken was still alive when the girls went into the living room. Brenda told Kimberly and Rachel to go get Chris Wetherbee and when they returned, a mop handle was protruding from Finken's throat. The mop was not among the original weapons. We find no error.
Lawrence argues that the killing was not heinous, atrocious, or cruel (HAC). We disagree. Competent substantial evidence supports the trial court's finding. This was a massive beating, and although defensive wounds could not be detected, the medical examiner explained that any such wounds would have been obscured by the burned condition of Finken's body. The girls heard Finken pleading for his life, and he was alive *1222 when the mop handle was shoved down his throat. We have consistently upheld HAC in beating deaths. See, e.g., Bogle v. State, 655 So.2d 1103 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 483, 133 L.Ed.2d 410 (1995); Whitton v. State, 649 So.2d 861 (Fla.1994), cert. denied, ___ U.S. ___, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); Colina v. State, 634 So.2d 1077 (Fla.), cert. denied, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). We find no error.
As his last point, Lawrence claims that the court erred in failing to find statutory mitigating circumstances and in rejecting the disparate treatment of Brenda (she was sentenced to life) as a mitigating circumstance. We disagree. The trial court's sentencing order is sound. It shows that the trial court considered all the proposed mitigating circumstances, found some as established and others not. Competent substantial evidence supports the trial court's findings. See Campbell v. State, 571 So.2d 415 (Fla.1990). We find no error.
Based on the foregoing, we find that the conviction for first-degree murder is adequately supported in the record and the sentence of death is proportionate. We affirm the convictions and sentences.[4]
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., concurs.
ANSTEAD, Justice, concurring in part and dissenting in part.
I concur with the majority's opinion except as to its affirmance of the trial court's finding that the evidence in this case proves beyond a reasonable doubt that the murder was committed in a cold, calculated, and premeditated manner (CCP). See § 921.141(5)(i), Fla. Stat. (1995). As tragic as this murder was, it does not fit this description, and it is telling that neither the trial court in its sentencing order, nor the majority opinion, explains how the facts of this case meet the "coldness" element required to support the CCP aggravator.
To begin with, we have consistently held that the CCP aggravator "normally, although not exclusively, applies to execution-style or contract murders." Douglas v. State, 575 So.2d 165, 167 (Fla.1991). That description accurately suggests the kind of homicides to which this aggravator was intended to apply. Our case law is now well-settled that four distinct elements must be clearly established to support a finding that the CCP aggravating factor exists beyond a reasonable doubt. See Jackson v. State, 648 So.2d 85, 89-90 (Fla.1994). First, the killing must be "cold," i.e., the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage. Second, it must be "calculated," i.e., the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident. Third, the defendant must have exhibited "heightened premeditation," i.e., something more than that necessary to prove the premeditation prong of first-degree murder. And finally, as a fourth element, it must be shown that the defendant acted with no pretense of moral or legal justification. Id.
We have often found that the CCP aggravator does not apply to "domestic" killings, like this one, not because they arise in domestic settings per se, but rather because the passion and emotion involved in such cases ordinarily do not reflect "calm and cool reflection," and are more appropriately characterized as "mad acts prompted by wild emotion." See Santos v. State, 591 So.2d 160, 163 (Fla.1991). Thus, we have consistently held that a murder which is the product of jealous emotion cannot be reconciled with the "coldness" component of the CCP aggravator even where there is evidence of planning and premeditation.
In a remarkably similar case involving a "love triangle," a husband killed a man he thought had sexual relations with his wife, after brooding about it for some two months. The husband had sought to force the wife to press rape charges against the man but she *1223 would not. In reversing the trial court's finding of CCP we declared:
Under the circumstances, the murder of Boisvert was not "cold," although it may have been "calculated." On the facts of this case, "[t]here was no deliberate plan formed through calm and cool reflection, only mad acts prompted by wild emotion." Santos v. State, 591 So.2d 160, 163 (Fla. 1991) (citation omitted). The emotional distress apparent from this record mounted over a two-month period, during which time Cannady continued to believe that Boisvert had raped his wife, causing her physical and emotional pain.
Cannady v. State, 620 So.2d 165, 170 (Fla. 1993). Obviously, the spontaneous and emotional decision to kill in the present case cannot pass muster as CCP under the standard adopted in Cannady. As we expressly noted in Cannady, the killing may have been calculated, but it was hardly cold.
In Spencer v. State, 645 So.2d 377, 384 (Fla.1994), for example, we struck the CCP aggravator because the element of "coldness" was lacking. Spencer was convicted of murdering his estranged wife whom he believed was trying to steal a business which they shared. We held that mental mitigating circumstances, including an inability to cope with emotions while under stress, negated the "coldness" component even though the defendant had attacked his victim two weeks prior to the actual murder and told her son, "You're next; I don't want any witnesses." Id. at 379. Although recognizing that the murder involved some degree of planning and premeditation, we nevertheless concluded that CCP could not be established because the murder was the product of an irrational and passionate rage, directly the opposite of "cold." Id. at 384. See also Maulden v. State, 617 So.2d 298 (Fla.1993); Richardson v. State, 604 So.2d 1107 (Fla. 1992); Douglas.
Under circumstances even more similar to those here, we held in Douglas that CCP had not been proven in a murder arising out of a love triangle. Douglas forced his ex-girlfriend and her husband to perform sexual acts on one another during an extended four-hour ordeal that finally ended when Douglas shot the husband in the head. We explained:
The passion evidenced in this case, the relationship between the parties, and the circumstances leading up to the murder negate the trial court's finding that this murder was committed in a "cold, calculated, and premeditated manner without any pretense of moral or legal justification."
575 So.2d at 167. We reiterated that view in Santos, stating:
The opinion in Douglas ... rested on our conclusion that the killing arose from violent emotions brought on by the defendant's hatred and jealousy associated with the love triangle. In other words, the murder in Douglas was a classic crime of heated passion. It was not "cold" even though it may have appeared to be calculated. There was no deliberate plan formed through calm and cool reflection, only mad acts prompted by wild emotion.
591 So.2d at 163. These descriptions fit the instant case in every respect.
Any suggestion that Finken's murder was "cold" is simply inconsistent with the uncontested fact that Lawrence first fought with the victim only after learning immediately beforehand that Finken was having an affair with his wife. This initial altercation, along with Lawrence's jealousy (vividly demonstrated by the statement "If I see her leaning over Mike, I'll beat his ass"), clearly show that Lawrence was jealous and emotionally "heated" about the affair before the murder. After stewing over the news of the affair in an intoxicated state for several hours, Lawrence involved his wife in a hurriedly hatched scheme to kill the victim, a scheme which was anything but the product of "calm and cool reflection." The frenzied search about the house for weapons, Lawrence's emotionally charged attack on the victim, enlistment of the children and a neighbor to help "clean up" when they did not know what to do with the body, and then the couple's dancing together after finally disposing of it, all demonstrate that this killing was bizarre and wholly the result of "mad acts prompted by wild emotion." It was not the calm and cool, emotionless killing contemplated by the CCP aggravator.
*1224 The uncontroverted evidence in this case shows that Lawrence killed Finken in an emotionally frenzied "fit of jealousy" that brewed to a boil during the few hours that passed between the time he first learned of Finken's adulterous affair with his wife and the time of the murder. Although Lawrence and his wife whispered about their intentions to kill Finken, there is absolutely no evidence to show that they made any plans to carry out this murder except in the minutes before they actually went about doing it. For example, all the instruments used in the beating were makeshift weapons gathered just after the couple decided in a drunken haze that they would "knock off Mike." Similar to the emotions involved in Santos and Douglas, it is apparent that appellant murdered the victim here in an admitted jealous rage just hours after learning of the victim's adulterous affair with his wife. This in fact was the State's theory of the case: that Lawrence "stewed" over the revelation of the affair until he could stand it no longer and then killed his wife's lover. Thus, Finken's murder was a classic crime of passion and, for that reason, cannot be characterized as "cold."
Accordingly, I would hold that the trial court erred in finding that the CCP aggravator existed beyond a reasonable doubt for this murder.
KOGAN, C.J., concurs.
NOTES
[1] The court found that the murder had been committed while Lawrence was under sentence of imprisonment; that the murder was heinous, atrocious, or cruel (HAC); and that the murder was committed in a cold, calculated, and premeditated manner (CCP).
[2] The court found that Lawrence cooperated with police; Lawrence had a learning disability and low IQ; Lawrence had a deprived childhood; Lawrence was under the influence of alcohol at the time of the crimes; and Lawrence does not have a violent history.
[3] Lawrence claims that the court erred in the following matters: 1) proportionality; 2) finding CCP; 3) instructing on CCP; 4) finding HAC; 5) instructing on HAC; 6) failing to inform the jury that it could recommend life even if the mitigating circumstances did not outweigh the aggravating circumstances; 7) failing to find all possible mitigation.
[4] Issues 3, 5, and 6 were not preserved.