# Supreme Court of Florida

———————

No. SC14-1965
———————

**KEVIN G. JEFFRIES, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[July 13, 2017]

PER CURIAM.

Appellant Kevin G. Jeffries, Jr. was convicted for the first-degree murder of Wallace Reid Scott, armed burglary of a dwelling, and armed robbery. Jeffries was sentenced to death for the first-degree murder conviction after a jury recommended the death penalty by a vote of ten to two. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

## FACTS AND TRIAL

On April 6, 2013, Wallace Scott was found dead, sitting up against his bed, by a concerned neighbor, who had noticed an accumulation of newspapers. When officers from the Bay County Sheriff's Office (BCSO) arrived at Scott's residence,

a gate and back door to the house were open. There were no signs of forced entry into the home. The pool in the backyard was dirty and had not been cleaned recently. The house smelled strongly of bleach and other household cleaners. An empty gallon-size bottle of bleach, an empty can of Comet cleaner, and an aerosol canister of air purifier were found in the bedroom. A bottle of toilet-bowl cleaner was found turned upside-down, which allowed the liquid to soak into the carpet. Investigators found bleach stains throughout Scott's bedroom, and the carpet was so saturated that investigators had to frequently replace the paper boots they were wearing to prevent cross-contamination of the crime scene.

The house appeared to have been ransacked. In the bedroom where Scott was found, the bed had been pushed aside and was askew from its box springs. Electric cords that had been cut and belts were found next to Scott, who was found with ligature marks on his ankles and legs. There was blood on the floor next to Scott. Investigators also found a plunger, a pair of scissors, and the tip of a blue latex glove in the bedroom, as well as a wooden box containing shotgun shells. A fire poker that contained no traces of soot was also found on top of a washing machine.

The medical examiner found that Scott had abrasion and impact injuries on his face and a fractured nose. There was also a lacerating injury to his left ear that was forceful enough to split the ear. Scott had lacerations across his upper body,

hands, and neck, as well as several fractures of his ribs. The medical examiner later testified that some of these injuries could have been inflicted by a long, cylindrical object such as a fire poker. Additionally, the medical examiner noted that Scott's ankles had been bound, and there was some evidence of binding on his left wrist. There were also superficial sharp-force injuries to Scott's penis.

BCSO investigators initially identified Sherri Mercer as a person of interest in Scott's murder. She had served as Scott's live-in caretaker for several years until a few weeks before Scott's death. Scott had introduced her to a friend, a private investigator, whom Scott asked to assist Mercer in obtaining a driver's license. The private investigator suspected that Scott and Mercer had a personal relationship, and Mercer's sister, Mary Goldsmith, the mother of Jeffries, later testified that Mercer had a sexual relationship with Scott that Mercer did not enjoy; however, Mercer later denied that her relationship with Scott was sexual in nature. In February 2013, Scott executed a will that named Mercer as the principal beneficiary of his estate, which included his residence and several pieces of real property. Mercer also had a joint checking account with Scott and access to one of his credit cards.

A female friend of Mercer's had lived in Scott's home with Mercer and Scott until sometime in February 2013, when Scott evicted the friend, and Mercer moved out with her. Mercer continued to use the credit card and write checks from

the joint account. Apparently, these actions were done without the consent of Scott, who filed a complaint with the BCSO on March 14, 2013, against Mercer for claims of credit card and check fraud. However, he subsequently informed law enforcement that he did not wish to prosecute Mercer for these offenses. Around the same time, Scott also contacted the friend who was a private investigator and asked him for assistance with amending his will and power of attorney.

Although Mercer remained a person of interest throughout the investigation, investigators later sought to arrest Jeffries after results from DNA testing of the tip of the blue latex glove matched both Scott and Jeffries. At that time, Ashley Griffin, Jeffries's girlfriend, also became a suspect. Officers first located and arrested Griffin in Georgia, and she agreed to assist law enforcement in the apprehension of Jeffries and his cousin, David Challender, the son of Sherri Mercer. Following his arrest, Jeffries admitted to officers that he participated in the burglary and fatal assault on Scott. During trial, Griffin testified on behalf of the State with respect to the events that culminated in the murder of Scott, and her testimony was largely corroborated by Jeffries's post-arrest statement, a recording of which was admitted during trial.

On April 4, 2013, Jeffries, Challender, and Griffin decided to leave Challender's home in Atlanta and travel to Panama City to commit robbery, including the robbery of Scott. Scott was known to each of them: Jeffries and

Griffin had met him on at least one occasion, and Challender had stayed with Mercer and Scott in January or February 2013. Challender believed that Scott kept money and valuable guns in his house. Several weeks before the decision to travel to Panama City, Challender also told Jeffries that he wanted to drown Scott in his own pool, which Jeffries understood as an offhand comment at the time. There was also some evidence presented that the plan to travel to Panama City would also permit Challender to travel to his mother's upcoming wedding to another individual.

Throughout the two weeks leading up to this decision, all three had chronically consumed methamphetamines and marijuana. They had also been awake for several days prior to the murder. Griffin agreed to use her car as their vehicle. En route, an officer pulled the car over in Dothan, Alabama, while Jeffries was driving the car. Although Griffin had an outstanding warrant for check fraud, the officer only issued Jeffries a ticket for a traffic violation and permitted them to proceed without arresting Griffin.

After arriving in Lynn Haven later that day, they purchased gloves from a local Walmart. This purchase was confirmed by surveillance footage and a receipt from Walmart. Jeffries also informed officers that they had purchased zipties earlier that day as well. After purchasing gloves from the local Walmart, they drove past Scott's house several times that day and waited until dark. They knew

that Scott, who was ninety years old and suffered from some hearing loss, usually went to sleep fairly early in the evening. Griffin dropped Jeffries and Challender off at Scott's home, with the understanding that she would return to Alabama while Jeffries and Challender would stay at Scott's home for a week and use his debit cards and credit cards.

Jeffries and Challender entered Scott's home through a back window that Challender knew was unlocked. As they crawled through the kitchen toward Scott's bedroom, lights in the bedroom were suddenly turned on, and a physical fight between Scott and Challender ensued. Jeffries later admitted that he chose to participate in the attack by subduing Scott after Challender requested his assistance. Challender continued to beat Scott as Jeffries worked to restrain Scott with a belt and electric cords. At some point, Challender obtained two guns that were next to Scott's bed, beat Scott with one, and handed the other to Jeffries. Challender demanded that Scott reveal the personal information number (PIN) for his debit and credit cards.

Approximately twenty minutes after she had left Jeffries and Challender at Scott's residence, Griffin received a phone call from Jeffries, who asked her to return. When she arrived, Griffin did not want to enter the house; however, Jeffries exited the house and sat in the car with Griffin for a few minutes as they smoked marijuana and a cigarette before they entered the house.

According to Griffin and Jeffries, Challender was the principal attacker, while Jeffries spent most of his time rummaging through the house for items to take, and Griffin was directed to use household cleaning products to clean the blood from the carpet. When Scott refused to disclose his PIN, Challender threatened to cut off his genitalia with scissors and sodomize him with a toilet plunger. Challender apparently displayed some degree of force to support these threats, as Scott was found with superficial lacerations on his penis, and Griffin testified that she saw Challender strike Scott on the buttocks with the plunger. Challender later informed Jeffries that Scott bit him during their initial struggle and told Jeffries that if they were apprehended, he would tell law enforcement that Griffin caused the injuries to Scott's penis. At some point in the evening, Scott told Jeffries that he would cooperate if Jeffries removed the restraints and helped him sit up, which Jeffries did. Jeffries also apologized to Scott. After rendering some aid to Scott, Jeffries later returned to the bedroom, but realized Scott had died. Upon exiting Scott's house, the group took $100 in cash, a ring, four guns, and a clock.

After they left Scott's residence, Jeffries, Griffin, and Challender engaged in a series of arguments that escalated into Challender and Jeffries pointing weapons at each other. The three eventually parted ways, and Griffin was arrested shortly thereafter and assisted law enforcement in the arrests of both Jeffries and

Challender. After Griffin was arrested, officers impounded and searched her car pursuant to a warrant.

On May 22, 2013, Jeffries, Griffin, and Challender were indicted for first-degree murder, armed burglary of a dwelling, and armed robbery. After the cases were severed, the State proceeded against Jeffries in a one-week trial. Griffin pleaded guilty to second-degree murder, principal to armed burglary, and principal to armed robbery; in exchange for cooperating with the State, she received a twenty-year sentence. Griffin, who was by that time Jeffries's fiancée, testified on behalf of the State during Jeffries's trial, but Challender did not testify. The State also presented testimony from Scott's granddaughter and friends, who all testified that Scott was an active ninety-year-old man who swam regularly. However, one witness described that during his last week, Scott suffered back pain from an old injury that prevented him from swimming, and Scott did have some trouble walking.

The State also presented several law enforcement officers and technicians from BCSO, as well as the surveillance footage and a receipt from the Lynn Haven Walmart to confirm that Jeffries, Griffin, and Challender purchased gloves on April 4, 2013. Kelly Dowd, an analyst from the Florida Department of Law Enforcement, offered testimony regarding the DNA testing performed on various items recovered from Scott, his home, and Griffin's car. Dowd testified that the tip

of the blue glove contained a mixed DNA profile matching both Jeffries and Scott.

Further, electric cords recovered near Scott's body were found with blood and

handler DNA, which may be left on an object via skin contact.  Testing of that

DNA provided a match to Scott's known DNA profile.  Blood obtained from a pair

of men's blue jeans recovered from Griffin's car also matched Scott.  Officers also

recovered a black T-shirt from Griffin's car that contained blood from a mixed

profile: the major contributor of blood from the T-shirt was Scott, and the minor

contributor of blood was Challender.  Dowd also testified that blood and handler

DNA on the pair of scissors recovered from Scott's bedroom matched that of Scott.

Dr. Michael Hunter, the medical examiner for the Fourteenth Judicial

Circuit, also testified on behalf of the State.  In addition to describing the various

injuries that Scott suffered before his death, Dr. Hunter noted that some of the

injuries to Scott's hands and arms could have resulted from attempts to repel an

attacker.  He offered an opinion that the cause of Scott's death was strangulation,

along with blood loss from multiple blunt injuries, after noting that Scott had

internal bruising and bleeding on the soft tissues of his neck, a fractured hyoid

bone, and petechial hemorrhages in his eyes and lips.  According to Dr. Hunter,

Scott would have lost consciousness within seconds, and death would have

resulted several minutes later.  In light of Scott's age, Dr. Hunter noted that Scott,

who also suffered from atherosclerosis, emphysema, and a diseased kidney, was

likely to have succumbed to loss of consciousness and death sooner than a younger, healthier individual.

Following the testimony of Dr. Hunter, the State rested, and Jeffries presented Dr. William Robert Anderson, who challenged Dr. Hunter's opinion regarding the cause of death. According to Dr. Anderson, Scott suffered partial strangulation, as evidenced by the petechial hemorrhages and injuries to his neck. However, Dr. Anderson opined that Scott was revived from the partial strangulation, but ultimately died from aspiration of blood into his lungs as a result of multiple injuries. Dr. Anderson reached this conclusion based on the volume of blood found in Scott's lungs, a factor that Dr. Hunter opined was insignificant. After the testimony of Dr. Anderson, the defense rested. On July 17, 2014, the jury convicted Jeffries of first-degree murder under theories of both premeditated and felony murder, as well as armed burglary of a dwelling, and armed robbery.

During the penalty phase, the State did not present any further evidence. Jeffries presented testimony from family members regarding his childhood and upbringing. According to various family members, Jeffries and his siblings were placed in foster care for several years while his mother, Mary Goldsmith, was incarcerated. An aunt of Jeffries testified that Mary verbally abused Jeffries. Darrell Goldsmith, the ex-husband of Mary and stepfather of Jeffries, testified that he treated Jeffries as his son. Further, Darrell testified that Challender, Jeffries's

cousin, was a bad influence on Jeffries: after Challender sold Darrell a motorcycle that turned out to be stolen from Challender's father, Darrell discouraged Jeffries from spending time with Challender.

Jeffries also advanced a theory that Challender, the son of Sherri Mercer, was the primary individual who planned and carried out the attack on Scott. Although officers could not place Mercer at the scene of the crime, evidence was presented that she knew she was the beneficiary of Scott's estate. She later wrote a letter to Scott, alleging that he was evil and complaining about her inability to access their shared account. Another witness testified that when Mercer learned of Scott's death, she repeatedly expressed happiness over her expected inheritance. Mary Goldsmith, the twin sister of Mercer and Jeffries's mother, testified that Mercer had confided in her that Scott was a "pervert" who forced her to perform oral sex on him. Mercer told Mary that she did not enjoy this relationship and that she wanted to cut off Scott's penis and sodomize him with it. However, Mercer herself denied many of these claims. Mercer insisted that Scott was a kind individual who had helped her and several members of her family, including her son Challender and her sister Mary. On July 18, 2014, the jury recommended the death penalty by a vote of ten to two.

The trial court conducted a <u>Spencer</u>[1] hearing on August 29, 2014. Jeffries presented evidence that he did not have serious disciplinary records while he was incarcerated at the BCSO jail. Griffin offered additional testimony that all three of them were high on methamphetamines during the forty-eight hour period prior to Scott's murder. She also testified that when Jeffries was high, he was more willing to follow along with Challender's suggestions than to challenge them, and that Challender spent much more time with Scott than Jeffries did.

Jeffries also testified during the <u>Spencer</u> hearing. He stated that it was Challender's idea to drive from Challender's home in Atlanta to Lynn Haven to commit a robbery, and that Challender renewed this idea after they were pulled over in Dothan and Griffin became concerned about a lack of money. When he and Challender entered Scott's house, Challender knew that Scott went to bed around 8 p.m. and knew of an open window in the kitchen. After Scott turned on the lights and Challender attacked him, Jeffries testified that he considered running away at that point until Challender asked him for help subduing Scott; he admitted during cross-examination that he made the conscious decision to assist Challender and participate in the attack on Scott. He later asked Scott if there was anything

---

1. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

Scott wanted or needed and removed the restraints after Scott asked him to do so. Jeffries also denied that he was the individual who strangled Scott.

Following the Spencer hearing, defense counsel filed an addendum to the sentencing memorandum that noted that Challender, who did not testify during Jeffries's trial, had pleaded guilty to first-degree murder. Challender was sentenced to life imprisonment.

The trial court issued its sentencing order on September 26, 2014. The court found that the State had established the following four aggravating factors beyond a reasonable doubt: (1) Jeffries committed the capital felony during the course of a burglary and/or robbery (great weight); (2) the murder was especially heinous, atrocious, and cruel (HAC) (great weight); (3) the murder was cold, calculated, and premeditated and without any pretense of moral justification (CCP) (great weight); and (4) Scott was a particularly vulnerable victim due to his age (some weight). The court also found the existence of six mitigating factors: (1) Jeffries suffered an abusive childhood (little weight); (2) he acted under the influence or control of an extreme mental or emotional disturbance due to the fact that he was high on methamphetamines before the murder (little weight); (3) he acted under the extreme duress or substantial domination of Challender (little weight); (4) Jeffries has been a model prisoner during his incarceration (little weight); (5) he cooperated with law enforcement during the investigation (little weight); and (6)

- 13 -

Challender received a life sentence (little weight). With respect to the final nonstatutory mitigating factor, the trial court refused to conduct a relative culpability analysis between Jeffries and Challender because Challender's lesser sentence was the result of a plea negotiation. Upon weighing the aggravation and mitigation, the trial court sentenced Jeffries to death for the murder of Scott and life imprisonment for the additional convictions.

This review follows.

## ANALYSIS

## Guilt Phase

Although Jeffries does not allege that any errors occurred during the guilt phase of his trial, this Court has an independent obligation to ensure that competent, substantial evidence supports his convictions. See, e.g., Brown v. State, 143 So. 3d 392, 407 (Fla. 2014) (citing Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5)). After reviewing the evidence in the light most favorable to the State, this Court will affirm the convictions if a rational trier of fact could have concluded that the elements of the crime have been proven beyond a reasonable doubt. Id. Additionally, when a jury finds a defendant guilty of first-degree murder following instructions on both premeditated and felony murder, we will affirm the conviction if competent, substantial evidence supports

- 14 -

at least one of the theories of conviction. See Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).

We conclude that competent, substantial evidence supports Jeffries's convictions under both premeditated murder and felony murder. During Jeffries's trial, both circumstantial and direct evidence were presented to the jury regarding Jeffries's intent to participate in the burglary and robbery of Scott. The tip of a torn rubber glove with DNA that matched Jeffries was found near Scott's body. Surveillance footage and a receipt from Walmart indicated that Jeffries, Challender, and Griffin purchased rubber gloves on the day of the murder. Scott's blood was found on clothing recovered from Griffin's car. Griffin testified that the three of them planned to drive to the Panama City area to rob Scott, and they took $100 in cash, a ring, four guns, and a clock when they left. Testimony from law enforcement officers confirmed that two handguns and two larger guns belonging to Scott were never recovered. Griffin testified that she heard Challender demand the PIN to Scott's credit or debit cards and ask Jeffries for his assistance in torturing Scott, while Jeffries searched the house for items to steal. She also told the jury that Jeffries smoked marijuana with her outside the house before he returned to the house with Griffin.

Most importantly, Jeffries's own account confirmed his involvement. In his post-arrest statement, Jeffries confessed to law enforcement that he knew

- 15 -

Challender wanted to rob Scott, and they purchased gloves and zipties in anticipation of that crime. They drove past Scott's house several times that day and waited until it was dark before entering through a back window of Scott's home. When Scott turned on the lights and Challender proceeded to attack Scott, Jeffries admitted that he participated in beating Scott and eventually restrained Scott by the ankles and wrists with electric cords. He further admitted that he accepted a gun from Challender, although he denied that he himself struck Scott with a gun as Challender did. He also admitted that he searched the house and took the guns with them when they left. Finally, although not considered by the jury, Jeffries admitted during his Spencer hearing that when Challender first asked him for help as Challender struggled with Scott, Jeffries paused and considered fleeing before he ultimately decided to help Challender subdue Scott. Although Jeffries insisted that he restrained Scott to prevent Challender from further beating him and that he later removed Scott's restraints at Scott's request, Jeffries admitted that he restrained Scott, participated in the assault on Scott, and did not stop Challender from torturing Scott in an attempt to force Scott to reveal his PIN. Therefore, we conclude that there is competent, substantial evidence to affirm Jeffries's convictions.

**Penalty Phase**

Regarding the penalty phase of his trial, Jeffries asserts four points of error: (1) the trial court erred when it instructed the jury regarding, and found the existence of, the CCP aggravating circumstance; (2) the trial court erred when it instructed the jury regarding, and found the existence of, the vulnerable victim aggravating circumstance; (3) Jeffries's sentence is disproportionate; and (4) Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).

**Proportionality**

Relative Culpability

When there are several participants to a capital offense, an analysis of the relative culpability of the parties often becomes relevant to defendants sentenced to death.  E.g., Shere v. Moore, 830 So. 2d 56, 61-62 (Fla. 2002).  If performed by the trial court, we do not disturb the factual findings regarding the relative culpability of codefendants that are supported by competent, substantial evidence.  Gonzalez v. State, 136 So. 3d 1125, 1165 (Fla. 2014); Puccio v. State, 701 So. 2d 858, 860 (Fla. 1997).  We may also consider relative culpability as part of our mandatory proportionality review, and may even entertain such issues as newly discovered evidence in a motion for postconviction relief.  Wright v. State, 19 So. 3d 277, 305

(Fla. 2009); <u>Stein v. State</u>, 995 So. 2d 329, 341-42 (Fla. 2008); <u>Scott v. Dugger</u>, 604 So. 2d 465, 468-69 (Fla. 1992).

However, a relative culpability analysis is not always conducted. For example, we have held that such a review cannot be performed if a codefendant is ineligible for the death penalty because of age or intellectual disability. <u>Farina v. State</u>, 801 So. 2d 44, 56 (Fla. 2001) (citing <u>Brennan v. State</u>, 754 So. 2d 1, 5-6 (Fla. 1999)); <u>Henyard v. State</u>, 689 So. 2d 239, 254 (Fla. 1996). Relative culpability is also inappropriate when a codefendant is adjudicated of a lesser offense that does not carry a possible sentence of death. <u>See, e.g.</u>, <u>Caballero v. State</u>, 851 So. 2d 655, 662-63 (Fla. 2003) (refusing to conduct relative culpability review because codefendant was found guilty of second-degree murder by a jury); <u>Shere</u>, 830 So. 2d at 61-62.

Additionally, we have historically refused to review the relative culpability of codefendants when a codefendant pleads guilty and receives a lesser sentence as a result. <u>E.g.</u>, <u>Krawczuk v. State</u>, 92 So. 3d 195, 207 (Fla. 2012); <u>Victorino v. State</u>, 23 So. 3d 87, 107 (Fla. 2009); <u>England v. State</u>, 940 So. 2d 389, 406 (Fla. 2006) (citing <u>Kight v. State</u>, 784 So. 2d 396, 401 (Fla. 2001); <u>San Martin v. State</u>, 705 So. 2d 1337, 1350-51 (Fla. 1997); <u>Brown v. State</u>, 473 So. 2d 1260, 1268-69 (Fla. 1985)). In such cases, we have indicated that we will not make further inquiry "where the codefendant's lesser sentence was the result of a plea

agreement or prosecutorial discretion." Kight, 784 So. 2d at 401; see also

McCleskey v. Kemp, 481 U.S. 279, 311-12 (1987) (refusing to consider

prosecutorial discretion regarding capital sentencing as arbitrary and capricious

under Gregg v. Georgia, 428 U.S. 153 (1976)).

A codefendant may be rendered ineligible for the death penalty by age,

intellectual disability, or the lack of at least one aggravating circumstance

established beyond a reasonable doubt. See Farina, 801 So. 2d at 56; Henyard, 689

So. 2d at 254; State v. Steele, 921 So. 2d 538, 545-46 (Fla. 2005) (explaining that

section 921.141, Florida Statutes, requires a finding of at least one aggravating

circumstance to impose the death penalty). Even assuming that the same

aggravating circumstances would apply to both a defendant and codefendant, the

codefendant might present very different mitigation than the defendant, which

potentially affects the decision of the State to seek the death penalty. Such

information rarely becomes part of the record of the defendant presently before the

Court for review. Indeed, in this case, codefendant Challender did not plead guilty

to first-degree murder and receive a sentence of life imprisonment until after

Jeffries's Spencer hearing. Therefore, there is little for us to truly compare,

beyond the facts of the crimes presented during the defendant's trial.

The trial court below did not consider the relative culpability of either

codefendant Challender, who pled guilty to first-degree murder, or codefendant

Griffin, who pled guilty to second-degree murder.[2]  We conclude that the trial

court properly applied existing law concerning relative culpability of a codefendant

who receives a lesser sentence as a result of a plea deal.  We further conclude that

Jeffries is not entitled to relief under our existing Florida law.  See Smith v. State,

998 So. 2d 516, 528 (Fla. 2008) ("We have previously rejected claims of disparate

sentencing when the codefendant's sentence resulted from his entry of a plea or

prosecutorial discretion." (citing England, 940 So. 2d at 406)).

Therefore, because we have historically refused to entertain claims of

disparate sentencing when one sentence is the result of a plea, we affirm the trial

court's refusal to consider the relative culpability of Jeffries and Challender.

Proportionality Review

The death penalty is reserved for the most aggravated and least mitigated

murders to ensure its uniform application.  E.g., McCray v. State, 71 So. 3d 848,

880 (Fla. 2011).  This evaluation requires that we do more than just simply weigh

the aggravating and mitigating circumstances; instead, we must qualitatively

review the basis for each established aggravating and mitigating circumstance.

Brown, 143 So. 3d at 405; Muehleman v. State, 3 So. 3d 1149, 1166 (Fla. 2009).

When reviewing the proportionality of a death sentence imposed by the trial court,

---

2. Jeffries does not claim that his sentence is disproportionate relative to
Griffin, who pleaded guilty to second-degree murder.

we accept the recommendation of the jury and the weight assigned by the trial court to aggravation and mitigation.  E.g., Guardado v. State, 965 So. 2d 108, 119 (Fla. 2007) (citing Bates v. State, 750 So. 2d 6, 12 (Fla. 1999)).  Further, we will not disturb the weight assigned to a particular mitigating circumstance absent an abuse of discretion by the trial court.  E.g., Russ v. State, 73 So. 3d 178, 199 (Fla. 2011).

The trial court found that the State had proven the existence of the following four aggravating circumstances beyond a reasonable doubt: (1) the capital felony was committed during the commission of a burglary and/or robbery (great weight); (2) HAC (great weight); (3) CCP (great weight); and (4) Scott was a particularly vulnerable victim (some weight).  The court also found that Jeffries had proven three statutory mitigating circumstances: (1) Jeffries suffered an abusive childhood (little weight); (2) he acted under the influence of an extreme mental or emotional disturbance because Jeffries and the other defendants had consumed methamphetamines before the murder (little weight); and (3) he acted under the extreme duress or substantial domination of codefendant Challender (little weight). The court found that Jeffries had also proven three nonstatutory mitigating circumstances—(1) he has been a model prisoner, (2) he cooperated with the investigation, and (3) Challender's life sentence—and assigned each little weight. The trial court found that two of the aggravating circumstances, HAC and capital

- 21 -

felony committed during the course of a burglary and/or robbery, alone, outweighed the established mitigation.

Jeffries cites to several cases to support his argument on the disproportionality of his sentence, but we find these cases to be distinguishable. Rather, we conclude that the aggravation and mitigation presented in this case is more similar to cases where we have concluded that death was a proportional punishment. For example, in Lawrence v. State, 698 So. 2d 1219, 1220-21 (Fla. 1997), the defendant and codefendant both participated in a murder in which the medical examiner determined that the cause of death was blunt trauma and possible asphyxia.[3] We considered death to be proportionate after a trial court found three aggravating circumstances (murder committed under a sentence of imprisonment, HAC, and CCP), no statutory mitigation, and five nonstatutory mitigating circumstances (the defendant cooperated with law enforcement; he suffered from a learning disability and had a low IQ; he had a deprived childhood; he acted under the influence of alcohol; and he had no prior criminal history). Id. at 1221 nn.1-2; see also Spencer v. State, 691 So. 2d 1062, 1063, 1065-66 (Fla. 1996) (finding death sentence proportionate in light of prior violent felony and

_____

3. The codefendant was tried separately and sentenced to life imprisonment; we summarily denied Lawrence's claim of disparate sentence, which was raised as an improperly rejected mitigating circumstance. Lawrence, 698 So. 2d at 1222.

- 22 -

HAC as aggravation, statutory mitigation that Spencer acted under the influence of an extreme mental or emotional disturbance and his capacity to appreciate the criminality of his behavior or conform his conduct to the requirements of law was substantially impaired, and nonstatutory mitigation that included a history of substance abuse, paranoid personality disorder, sexual abuse by his father, an honorable military record, positive employment history, and the "ability to function in a structured environment that does not include women").

Indeed, we have affirmed the death penalty in cases with less aggravation and/or more mitigation. See Brant v. State, 21 So. 3d 1276, 1284-88 (Fla. 2009) (affirming death sentence where trial court found two aggravating factors, including HAC and murder committed during the course of a sexual battery, three statutory mitigating factors, and ten nonstatutory mitigating factors); Johnston v. State, 863 So. 2d 271, 286 (Fla. 2003) (concluding that death was appropriate punishment where two aggravating factors, namely prior violent felony and HAC, one statutory mitigating circumstance, and twenty-six nonstatutory mitigating circumstances applied). Notably, in Ocha v. State, 826 So. 2d 956, 966 (Fla. 2002), we held that death was a proportionate punishment for a defendant who had strangled the victim multiple times. The State had presented evidence of three aggravating circumstances, including prior violent felony, HAC, and CCP; however, the trial court concluded that CCP had not been established beyond a

reasonable doubt.  Id. at 960.  When the trial court compared the two aggravating

factors against fifteen mitigating circumstances,[4] it concluded that the aggravation

outweighed the mitigation and sentenced Ocha to death, with which we agreed.  Id.

at 960, 966.

Accordingly, we disagree with Jeffries's assertion that the aggravation in

this case is minimal and the mitigation is substantial.  The trial court found four

valid aggravating circumstances that were assigned moderate to great weight.  One

of the unchallenged aggravating circumstances, HAC, has been held to be one of

the weightiest aggravating circumstances in Florida.  See, e.g., Jackson v. State, 18

So. 3d 1016, 1035 (Fla. 2009).  Further, Jeffries presented relatively little

mitigating evidence, all of which the trial court assigned little weight.  Finally, we

hold that the trial court did not abuse its discretion regarding the weight assigned to

the aggravation and mitigation because we conclude that a reasonable person could

reach the same conclusion as the trial court.  See, e.g., Knight v. State, 76 So. 3d

879, 886 (Fla. 2011); Russ, 73 So. 3d at 198 (finding no abuse of discretion

---

4.  The mitigation included Ocha's: (1) good behavioral record during prior
incarceration; (2) suicidal thoughts; (3) artistic ability; (4) prior head injuries; (5)
extensive history of substance abuse; (6) learning disability; (7) ability to form
positive relationships; (8) ex-wife, who encouraged him to seek a more
professional career; (9) military service; (10) post-traumatic stress disorder; (11)
violent childhood; (12) remorse; (13) intoxication with alcohol and ecstasy when
he committed the murder; (14) psychiatric disturbance; and (15) being a hard
worker during his prior incarceration.  Ocha, 826 So. 2d at 960.

regarding the weight assigned to mitigation). We therefore conclude that death is a proportionate punishment in this case.

## Hurst v. Florida and Hurst

Jeffries contends that Florida's capital sentencing scheme is unconstitutional in light of Ring v. Arizona, 536 U.S. 584 (2002), and Hurst v. Florida, 136 S. Ct. 616 (2016) (Hurst v. Florida), because the jury, which recommended death, failed to find the facts necessary to impose that sentence. We agree. See Hurst v. State, 202 So. 3d 40, 43-44 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (May 22, 2017).

New rules of law set down by this Court, or the United States Supreme Court, apply to cases on direct review or those not otherwise finalized. State v. Johnson, 122 So. 3d 856, 861 (Fla. 2013) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1987)). This case is before us on direct appeal; therefore, Jeffries's appeal is subject to Hurst. The jury below recommended death by a ten to two vote. Thus, Jeffries's death sentence violated the central holding of Hurst: all critical findings for the imposition of death must be found unanimously by the jury. See Hurst, 202 So. 3d at 53-54.

As this Court held in Hurst, such a sentencing error is capable of harmless error review. Id. at 67. Therefore, "[i]n the context of a sentencing error, the relevant question is whether 'there is [a] reasonable possibility that the error

contributed to the sentence.' " Johnson v. State, 205 So. 3d 1285, 1290 (Fla. 2016) (quoting Zack v. State, 753 So. 2d 9, 20 (Fla. 2000)), petition for cert. filed, No. 16-1252 (U.S. Apr. 17, 2017). Considering the nonunanimous jury recommendation and reasoning below, we reject the State's contention that any Hurst v. Florida error was harmless.

To be sure, Jeffries's actions were substantially aggravated. In addition to being committed during the course of a robbery, Jeffries and his codefendants drove from Atlanta, Georgia, broke into a 90-year-old man's home, armed themselves, tied Scott up so that he could not defend himself, tortured him, mutilated him, beat him, and strangled him. Further, the aggravators of HAC and CCP are two of the weightiest aggravators in Florida. See Butler v. State, 842 So. 2d 817 (Fla. 2003); Guardado v. State, 965 So. 2d 108, 119 (Fla. 2007).

However, as in Hurst, the record here demonstrates that there was mitigation to be considered. See Hurst, 202 So. 3d at 69. In fact, along with the statutory mitigators of Jeffries's (1) suffering an abusive childhood; (2) acting under the influence of an extreme mental or emotional disturbance; and (3) acting under extreme duress or under the substantial domination of another person, the trial court also assigned weight to three nonstatutory mitigating circumstances. These included circumstances that could have influenced the jury, including that: (1)

Jeffries was a model prisoner during his incarceration; and (2) he cooperated with law enforcement during the investigation.

As in Hurst and Johnson, we cannot conclude—beyond a reasonable doubt—that a Hurst v. Florida error did not contribute to Jeffries's sentence. See Hurst, 202 So. 3d at 69; Johnson, 205 So. 3d at 1290. This Court explained in Hurst,

> [b]ecause there was no interrogatory verdict, we cannot determine what aggravators, if any, the jury unanimously found proven beyond a reasonable doubt. We cannot determine how many jurors may have found the aggravation sufficient for death. We cannot determine if the jury unanimously concluded that there were sufficient aggravating factors to outweigh the mitigating circumstances.

202 So. 3d at 68. Such concerns apply with equal force here. We can merely conclude that two jurors, for whatever reason, determined that a life sentence was appropriate. This record, coupled with a ten-to-two jury recommendation and the mitigation presented, simply presents too many unanswered questions. Therefore, we must find reversible error and remand the case for a new penalty phase.

Moreover, we reject the State's assertion that Jeffries's simultaneous felony convictions are sufficient to insulate his death sentence from Hurst error. See Hurst, 202 So. 3d at 53 n.7. Likewise, in Hurst, this Court rejected Jeffries's argument that section 775.082(2), Florida Statutes (2015), requires a remand to the trial court for the imposition of a life sentence. See id. at 63-66.

Accordingly, we affirm Jeffries's conviction, vacate his death sentence, and remand for a new penalty phase.

## CONCLUSION

We conclude that there is sufficient evidence to support Jeffries's convictions. However, we hold that, under Hurst, Jeffries is entitled to a new penalty phase. Therefore, we affirm his convictions, vacate his death sentence, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
LAWSON, J., concurs specially with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

PARIENTE, J., concurring in part and dissenting in part.

I concur in part because Jeffries is entitled, at the very least, to a new penalty phase pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017). However, I dissent in part because I

conclude that under our precedent, Jeffries's death sentence should be reduced to life imprisonment because an equal or more culpable defendant, Challender, received a life sentence based on a conviction for first-degree murder.

Testimony adduced at trial indicates that Challender was the "prime instigator" of the burglary and armed robbery, Hazen v. State, 700 So. 2d 1207, 1214 (Fla. 1997), had greater motive to commit the murder, and spent more time alone with the victim before the murder. According to Griffin, a third codefendant who was Jeffries's girlfriend at the time of the murder and assisted law enforcement in apprehending Challender and Jeffries, Challender suggested targeting the victim in Panama City when the three codefendants needed money. Challender also knew that a window in the victim's house would be open.[5] According to evidence presented at trial, including Griffin's testimony, the victim died in his bathroom after Challender struck him with a toilet plunger and tortured him by threatening to mutilate his genitals if he did not disclose his debit card's PIN. For most of the time that Challender was in the bathroom with the victim, Jeffries was elsewhere in the house searching for valuables to steal. Moreover, the evidence indicates that Challender's motive to torture and kill the victim was much stronger than Jeffries's. The record reflected that all three defendants knew the

_____

5. Officers found no sign of forced entry.

- 29 -

victim, but Challender had actually stayed in the victim's home with the victim, and Mercer, Challender's mother, had a romantic relationship with the victim. Although the extent of the relationship between the victim and Mercer is unclear, it strains logic to accept that Mercer's nephew, Jeffries, rather than her son, Challender, had an equal or greater motive to rob, kill, and mutilate the victim's genitals following the end of Mercer's relationship with the victim. In fact, before the murder, Challender told Jeffries that he wanted to drown the victim in his pool. Further, on the way to the victim's house, Challender also indicated he wanted to "whip" the victim.

Despite this evidence, the plurality disregards Challender's equal or greater culpability simply because the prosecutor offered Challender a plea deal. See majority op. at 20. The plurality's failure to conduct a relative culpability analysis contradicts our decision in McCloud v. State, 208 So. 3d 668 (Fla. 2016), and our other precedent on relative culpability. Either the plurality has receded sub silentio from McCloud and our precedent requiring a relative culpability review between codefendants or has chosen to, without explanation, confuse this Court's relative culpability jurisprudence in cases where the record establishes that a codefendant, who accepted a plea to first-degree murder in exchange for a life sentence, is equally, if not more culpable, than the defendant.

In McCloud, we "reject[ed] any principle of law that hamstrings this Court's ability to conduct a full proportionality review, including a relative culpability analysis, simply because the State allowed a codefendant to enter a plea to murder that resulted in a life sentence." Id. at 688. To ensure that the death penalty is not imposed arbitrarily or capriciously, this Court must determine whether legitimate reasons exist why one defendant is sentenced to death and another equally culpable or more culpable defendant receives life imprisonment for first-degree murder based on a guilty plea. See id. at 689 (explaining that the fact that the codefendants "were convicted of a lesser degree of murder is not dispositive of their relative culpabilities"). While I appreciate that there is prosecutorial discretion involved in the decision whether to offer one defendant a plea deal while seeking the death penalty against the other defendant, I disagree that this discretionary decision renders the relative culpability of the death-sentenced defendant unreviewable in all cases. See id. at 688. In fact, this Court has conducted a relative culpability analysis even when a prosecutor had made "the strategic decision to give [the codefendant] a life sentence in exchange for testimony putting [the defendant] at the scene of the crime," without which the State would only have had circumstantial evidence against the defendant. Hazen, 700 So. 2d at 1211-12.

Our obligation to review the sentences of similarly situated individuals has been part of our proportionality review since we upheld the death penalty in <u>State v. Dixon</u>, 283 So. 2d 1, 7 (Fla. 1973). <u>See also</u> <u>Fitzpatrick v. State</u>, 527 So. 2d 809, 811 (Fla. 1988); <u>Slater v. State</u>, 316 So. 2d 539, 542 (Fla. 1975). As this Court explained in <u>Scott v. Dugger</u>, 604 So. 2d 465, 468 (Fla. 1992), "Even when a codefendant has been sentenced subsequent to the sentencing of the defendant seeking review on direct appeal, it is proper for this Court to consider the propriety of the disparate sentences in order to determine whether a death sentence is appropriate given the conduct of all participants in committing the crime."

I acknowledge, as the plurality explains, that there may be cases where a defendant's relative culpability cannot be assessed from the face of the record. <u>See</u> majority op. at 19. This is not such a case, where the evidence adduced at trial indicates that Challender had greater motive to commit the murder, spent more time alone with the victim before the murder, and was the prime instigator of the burglary and armed robbery. At the very least, we should remand for an evidentiary hearing on the issue of Jeffries's culpability relative to Challender's so that the trial court can conduct a proper assessment.

Thus, consistent with our precedent that has "long recognized" that a less culpable defendant cannot receive a death sentence when an equal or more culpable codefendant receives a lesser sentence, <u>McCloud</u>, 208 So. 3d at 688

- 32 -

(citing Hazen, 700 So. 2d at 1214), Jeffries's sentence of death must be vacated and his sentence reduced to life imprisonment without the possibility of parole. Accordingly, I dissent as to the plurality's refusal to consider the life sentence of the codefendant. I can only hope that in a new sentencing hearing, the jury will be able to review the relative culpability of Challender and Jeffries as a basis for rendering a verdict for life imprisonment rather than death for Jeffries. In my view, any other result in this case would be an injustice.

QUINCE, J., concurs.

CANADY, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence based on Hurst v. Florida, 136 S. Ct. 616 (2016). As I explained in my dissent in Hurst v. State, the only flaw identified by the Supreme Court that rendered Florida's former death penalty statute unconstitutional was its failure to require a jury finding of an aggravating circumstance. See Hurst v. State, 202 So. 3d 40, 77 (Fla. 2016) (Canady, J., dissenting) (noting "the Hurst v. Florida Court's repeated identification of Florida's failure to require a jury finding of an aggravator as the flaw that renders Florida's death penalty law unconstitutional"), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017); see also Hurst v. Florida, 136 S. Ct. at 624 ("Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional."). But

Jeffries's jury did make a finding as to the existence of an aggravating circumstance—that the murder was committed while Jeffries was engaged in the commission of a burglary and/or a robbery. The jury unanimously determined that this aggravating circumstance was proven beyond a reasonable doubt as reflected in its separate, contemporaneous verdicts finding Jeffries guilty of armed burglary of a dwelling and armed robbery. Thus, Jeffries is not entitled to relief under Hurst. The other penalty phase issues raised by Jeffries are without merit. Accordingly, I would affirm Jeffries's death sentence.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Bay County,
    Brantley Scott Clark, Jr., Judge - Case No. 032013CF001138XXCXMX

Andy Thomas, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

    for Appellee